600 F.2d 429
 26 Cont.Cas.Fed. (CCH) 83,417
 SEA-LAND SERVICE, INC., Appellee,
v.
Harold BROWN, Individually and in his capacity as Secretary
of Defense, W. Graham Claytor, Individually and in his
capacity as Secretary of the Navy, Rear Admiral John D.
Johnson, Jr., Individually and in his capacity as Commander,
Military Sealift Command, Captain J. A. Raymond,
Individually and in his capacity as Contracting Officer,
Department of the Navy, Military Sealift Command, and United
States of America, Appellants in Nos. 78-2372 and 78-2668.
Appeal of FOSS ALASKA LINE, Defendant-Intervenor in Nos.
78-2360 and 78-2669.
 Nos. 78-2360, 78-2372, 78-2668 and 78-2669.
 United States Court of Appeals,
Third Circuit.
 Argued May 3, 1979.
Decided June 11, 1979.
 
 Gerald A. Malia (argued), Ragan & Mason, Washington, D. C., (Jeffrey L. Reiner, Meyner, Landis & Verdon, Newark, N. J., of counsel), for appellee Sea-Land Service, Inc.
 Marc S. Friedman, Newark, N. J., Harold E. Mesirow (argued), James H. Heller, Washington, D. C., for appellant Foss Alaska Line.
 Robert J. Del Tufo, U. S. Atty., Newark, N. J., Anne C. Singer (argued), Asst. U. S. Atty., Newark, N. J. (E. Duncan Hamner, Jr., Dept. of the Navy, Washington, D. C., of counsel), for Harold Brown, etc., et al. and United States.
 Before ADAMS, GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In general, a district court may not substitute its judgment for that of a contracting officer who has a rational basis for awarding a governmental procurement contract. It is permissible for an agency to accept a bid having a computation formula different from the one contained in a proposal to negotiate a contract when the variation is one of form rather than substance. The district court's contrasting view of the negotiations resulted in an undue limitation on the contracting officer's discretion and cannot be sustained. Accordingly, we vacate a preliminary injunction and declaratory judgment having the effect of setting aside the award of a contract to one bidder and granting it to another.
 
 
 2
 The United States Navy Military Sealift Command requested bids for shipping cargo from Seattle, Washington to Adak, Alaska over a two-year period. Bids were submitted by Sea-Land Service, Inc., which was currently serving that route, and by the Foss Alaska Line. On April 7, 1978, the Navy notified the parties that Sea-Land would be awarded the contract. Foss protested this decision, and after re-evaluating the bids, the Navy determined that Foss's was the lower one. Because the bids varied in form, however, the contracting officer decided to reopen the matter and allow both parties to submit revised offers. Upon learning that its contract had been cancelled, Sea-Land filed suit in the district court for injunctive and declaratory relief against the United States and its officers. Foss intervened, seeking similar relief. The parties then entered into a consent order agreeing to submit the matter to the General Accounting Office (GAO) for its review.
 
 
 3
 On September 12, 1978, the GAO found in favor of Foss and soon thereafter, the government announced that the contract would be awarded to that line. Pursuant to the consent decree, the Navy moved for an order requiring Sea-Land to show cause why the contract should not be awarded to Foss. Sea-Land countered by renewing its motion for an injunction. After a hearing, the district court preliminarily enjoined the government from contracting with Foss. This court granted a stay of the district court's order on November 1, 1978, and on that date the contract was awarded to Foss, which immediately began shipping cargo to Adak.
 
 
 4
 After further proceedings, the district court entered a declaratory judgment in favor of Sea-Land on December 13, 1978. The court declined to enter a permanent injunction, commenting that such action would "merely invite another stay," but did retain jurisdiction for the granting of further and injunctive relief if that became necessary. Appeals from the grant of the preliminary injunction and the declaratory judgment have been consolidated and both are before us for disposition.
 
 
 5
 The bids were solicited under a Request for Proposals that spelled out the details of the contract and addressed the factors to be considered by prospective offerors in formulating their bids. The Request made clear that the contract was to be awarded on the basis of a negotiated procurement, not on competitive bidding solicited by advertisement. Under this procedure, discussions between the agency and individual bidders are expected to occur.[1] In addition, the Request indicated that the bids were to be broken down into charges for cargo in various shipping categories, rather than on a flat-sum basis. Two numerical components used in calculating the cost of one of these categories the shipping of containers to be packed ("stuffed") by the government constitute the nub of the dispute at hand. One calculation pertains to the minimum charge to be assessed for such containers and the other allocates the proportion that those containers bear to all the cargo shipped.
 
 
 6
 Because of the nature of the cargo, containers stuffed by the government frequently held less than 100 percent of capacity. To protect the carriers against inefficient stowage, the Request stipulated that a minimum charge be set for each such container on a 100 percent basis. In other words, the government agreed to pay for shipping 100 percent of capacity, no matter how much was actually in each container. Sea-Land did submit its bid on the 100 percent basis. Foss, however, prepared its charges on an 80 percent basis, which meant that if the container were stuffed to less than that percentage, the minimum charge would be 80 percent; but if the container were packed to more than that figure, the government would pay for the actual percentage being shipped.
 
 
 7
 When the Navy first examined the bids, it ignored the fact that the Foss proposal was on an 80 rather than on a 100 percent basis. When Foss's bid was recalculated, the Navy realized that the 80 percent factor resulted in a lower total bid price. It was then that the award to Sea-Land was cancelled. Sea-Land contends that Foss's use of the 80 percent basis was a material deviation from the Request invalidating the entire bid.
 
 
 8
 The second point of contention concerns the percentage of containers expected to be stuffed by the government to which the minimum charge would apply. Before preparing its bid, Foss asked the Navy for the historical experience on this point and was told that the figure was 29 percent. But the Navy later determined that the experience for the preceding few years on Seattle-Adak cargo was about 24 percent, and it was this figure that was actually used in appraising the bids of both Sea-Land and Foss. To the extent that the actual percentage was less than 29 percent, Foss's 80 percent minimum bid lost its attractiveness Pro tanto since the discount would apply to a smaller part of the total cargo covered under the contract.
 
 
 9
 Sea-Land, as the holder of the prior contract for the route, knew what had been the actual experience. Nevertheless, it prepared its bid in the expectation that the Navy would reduce its stuffing operations to about 10 percent. Neither party was told in advance that the government would use a 24 percent allocation. Sea-Land argues that the government erred in giving the 29 percent figure only to Foss, and in not disclosing in the Request what percentage would be used in computing the bids.
 
 
 10
 The GAO reasoned that Foss's utilization of an 80 percent minimum fee was a difference in form rather than in substance, and that no matter how calculated, the government's prime concern was with the total cost of the contract. Viewed from this perspective, Foss's bid was the lower and the GAO approved the award to that carrier. The GAO did not consider Sea-Land's objections to the 24 percent container proportion factor because, in the agency's view, Sea-Land had failed to raise the matter in a timely fashion. The district court, however, determined that Foss's bid was not in compliance with the Request, that it was not possible to conclude with certainty which proposal would result in lower cost to the government, and that since Sea-Land's proposal was responsive to the Request, it should be awarded the contract.
 
 
 11
 We first meet the question of jurisdiction. In Merriam v. Kunzig,476 F.2d 1233 (3d Cir.), Cert. denied, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), we recognized that an unsuccessful bidder for a government contract had standing to challenge an adverse procurement decision, not only on the basis of his own rights but those of the public as well. That case, however, did no more than determine that plaintiff had standing, and that on the record, summary judgment for the government was not appropriate. We did not reach the question whether the court could order the government to award the contract to a particular bidder. Cf. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 376, 424 F.2d 859, 864 (1970). That question is present in this case since Sea-Land's complaint includes a demand that it be awarded the contract and the district court has intimated that such relief could be forthcoming. Our examination of the authorities persuades us that the district court has no power to order the Navy to perform the contract with Sea-Land.
 
 
 12
 In Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), the Supreme Court held that a request for specific enforcement of a government contract directed against a specified officer ran afoul of the sovereign immunity doctrine. The rigors of that holding were eased somewhat by the 1976 amendments to the Administrative Procedure Act, Act of Oct. 21, 1976, Pub.L. No. 94-574, 90 Stat. 2721 (codified at 5 U.S.C. § 702). The amendment[2] in effect repealed the Larson holding but with the limitation that the revisions do not confer "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Id.
 
 
 13
 This reservation points up the jurisdictional problem because the statutory language implicates the Tucker Act and the Court of Claims' exclusive jurisdiction over government contract disputes that are in excess of $10,000. See 28 U.S.C. § 1491 (1976).[3] The APA amendments were not intended to afford plaintiffs an additional remedy when one had already been provided. Referring to the Tucker Act as an example of the kind of pre-existing remedy that was not to be affected by the abrogation of sovereign immunity in equity actions, the House Report commented that "the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts . . . ." H.R.Rep.No.1656, 94th Cong., 2d Sess. 12-13, Reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 6121, 6133.
 
 
 14
 Since plaintiffs could not get specific performance on a government contract prior to the amendments, either in the district court, See, e. g., Alabama Rural Fire Insurance Co. v. Naylor, 530 F.2d 1221, 1229-30 (5th Cir. 1976); International Engineering Co. v. Richardson, 167 U.S.App.D.C. 396, 402-03, 512 F.2d 573, 579-80 (1975), Cert. denied, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976), or in the Court of Claims, See, e. g., Glidden Co. v. Zdanok, 370 U.S. 530, 557, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.), it follows that they are not entitled to similar relief now in the district courts by virtue of the APA amendments. The one court of appeals to consider this question has reached the same conclusion. See American Science & Engineering, Inc. v. Califano, 571 F.2d 58, 63 (1st Cir. 1978). Therefore, insofar as the Navy was directed to continue its contract with Sea-Land, or such relief was contemplated, the district court acted beyond its jurisdiction.
 
 
 15
 We cannot tell from the record, however, whether the preliminary injunction directed the Navy to reinstate the contract with Sea-Land or merely sought to maintain the status quo pending final judgment. Without doubt, the court did enjoin the implementation of any contract with Foss. Enjoining the performance of a contract if the award was the result of procedures not comporting with the law is clearly within the district court's jurisdiction. See Merriam v. Kunzig, supra. But the court's order went on to require that the government maintain records showing shipping costs after November 1, 1978 under both the Foss and Sea-Land proposals, and further stated that, "payment of rates and charges to Sea-Land Service, Inc. for its services from and after that date at the rates under its proposal and until final judgment shall be subject to adjustment in accordance with that judgment if so directed therein." That recordkeeping requirement implied that Sea-Land was to carry cargo for the government after November 1, 1978, though the order did not directly say so. Ordering the Navy to award the contract to Sea-Land was beyond the court's authority.
 
 
 16
 The declaratory judgment issued on December 13, 1978 is similarly obscure, and lacking in the specificity required by Fed.R.Civ.P. 54. The court's judgment simply states: "1. Sea-Land's application for summary judgment declaratory relief is granted." Although the rules do not require that the judgment be prolix, it must be clear just what is being decided. We are not told whether the declaratory judgment applies only to the procedures that were followed or whether it includes an admonition that Sea-Land be awarded the contract. The opinion preceding the judgment is also far from explicit on this point. We are thus left with the alternative of referring to the complaint filed by Sea-Land. We do not consider this a satisfactory method of complying with the rules of civil procedure. We believe there should be a short, plain and concise statement of what the declaratory judgment includes so that there will be no necessity to go behind the judgment itself.
 
 
 17
 For the purpose of discussing the merits, we will construe the declaratory judgment to include only those matters within the jurisdiction of the district court. Thus it will be unnecessary to discuss any implications in the court's order on the retention of jurisdiction to grant "injunctive relief."[4] We turn then to the merits of the controversy insofar as the district court declared that the bidding was not proper and the contract awarded to Foss be set aside.
 
 
 18
 The courts have the obligation to insure agency compliance with statutory and regulatory law. When jurisdiction is exercised in the field of governmental procurement, there are three interests that must be weighed: the practical considerations of efficient procurement of supplies for continuing government operation; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through agency adherence to statutes and regulations. Judicial intervention in procurement disputes necessarily results in delay and the expenditure of funds on behalf of all parties, usually without measurable benefit to the public. Although much must depend on the circumstances, by and large, the courts have recognized the necessity of exercising restraint in interfering with procurement decisions and of recognizing a large measure of discretion in the contracting officers. Consistent with this approach is the standard of review first articulated by the Court of Appeals for the District of Columbia Circuit in M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971). That case held that courts should not overturn any procurement determination unless the aggrieved bidder demonstrates there was no rational basis for the agency's decision. Even when that showing has been made, prudent judicial discretion may still refuse declaratory or injunctive relief because of overriding public interests. Id. at 233, 455 F.2d at 1301. Accord, Kinnett Dairies, Inc. v. Farrow, 580 F.2d 1260, 1270-71 (5th Cir. 1978). A showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief.
 
 
 19
 In this instance, an additional factor militates against the overturning of the contracting officer's decision. The district court was aided by an opinion from the Comptroller General's Office, an agency with extensive experience in interpreting government procurement regulations and practices. See Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 245-46, 455 F.2d 1306, 1313-14 (1971). We need not decide in this case whether all disputes such as the one we have before us should first be submitted to the GAO before adjudication by the district court, though such a practice has much to commend it. See Merriam v. Kunzig, supra at 1244. It is enough that here the parties agreed, with permission of the court, to solicit the opinion of the GAO. Indeed, the Navy agreed in advance to accept the GAO determination.
 
 
 20
 The GAO found that the choice by Foss to submit a bid based upon an 80 percent utilization rate was a reasonable one offering the possibility of savings to the government. Moreover, this difference did not hinder the government's ability to compare the Foss and Sea-Land bids since total cost was to be the deciding factor. And, because the utilization factor was not the sole variable affecting the bottom line total, whatever advantage that accrued to Foss as a result of the 80 percent figure could have been offset by some other cost adjustments. In our view, the GAO's decision had a rational basis and was adequately supported by appropriate citation to similar decisions in other government procurement disputes. Although we recognize that ultimately the courts must have the last word, in these circumstances, it is appropriate to extend some deference to the GAO opinion.
 
 
 21
 The district court's role in this type of litigation is a limited one. It must not succumb to the temptation of substituting its judgment for the contracting officer's. The test is not what the court would have done had it been in the Navy's position but whether it can say that the action taken by the procurement officer was not rational. The action of the contracting officer in accepting the 80 percent rather than insisting upon a 100 percent calculation cannot be said to lack a reasonable basis, nor can we view it as being fundamentally unfair. Accordingly, it was error for the district court to overturn the agency's decision.[5]
 
 
 22
 The GAO did not rule on the Navy's use of the 24 percent factor representing the proportion of government-stuffed containers. Nevertheless, just as we find no lack of a reasonable basis in the acceptance of the 80 percent estimate bid neither do we find the government's use of the container proportion calculation to be unfair to the parties. The Navy did not disclose this percentage to either bidder. Indeed, insofar as that figure was less than the 29 percent basis relied upon by Foss, it constituted a detriment to that bidder. Sea-Land, on the other hand, had the advantage of having been the carrier for the route and consequently knew that the most recent data showed a 24 percent proportion. As the Navy's witness testified at the hearing: "They (Sea-Land) give us the numbers."
 
 
 23
 In gambling that the government would change its policy and use a lower factor, moreover, Sea-Land cites no misleading efforts by the Navy to justify that belief. Sea-Land believed that under the terms of the bid the Navy would have a strong incentive to reduce its own stuffing operations, and to shift as much as possible to the carrier. Although, theoretically, that may not have been an unreasonable belief on the carrier's part, an increase in the percentage of carrier-stuffed cargo was, as a practical matter, not feasible because of the nature of the cargo. There is, therefore, no reason why we should assume that the government's decision to abide by the prevailing experience rate was unreasonable or illegal.
 
 
 24
 We conclude, therefore, that the action of the Navy contracting officer was within the discretion entrusted to him and the decision to award the contract to Foss was not improper. Accordingly, the judgment of the district court will be vacated and judgment will be entered in favor of the defendants.
 
 
 
 [1]
 See 10 U.S.C. § 2304 (1976). See generally Note, The Private Rights of a Bidder in the Award of a Government Contract: A Step Beyond Scanwell, 24 Case W. Reserve L.Rev. 559, 561-62 (1973)
 
 
 [2]
 The amendment provides in pertinent part:
 "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."
 Act of Oct. 21, 1976, Pub.L. No. 94-574, 90 Stat. 2721 (codified at 5 U.S.C. § 702).
 
 
 [3]
 The Court of Claims and the district courts have current jurisdiction for claims against the government not exceeding $10,000. 28 U.S.C. § 1346(a)(2) (1976)
 
 
 [4]
 In the final paragraph of its order, the court said:
 "It is Further Ordered that, notwithstanding that the facts and law support Sea-Land's entitlement to permanent injunctive relief, Sea-Land's motion for permanent injunctive relief is denied because the stay of this Court's preliminary injunction by the Court of Appeals suggests that the grant of a permanent injunction now would merely invite another stay. However, jurisdiction will be reserved for the granting of other and further relief, including injunctive relief by way of execution or enforcement of the declaration, which may be applied for in the event that the present stay be vacated by the Court of Appeals or anyone else in authority and that it then appears the United States parties and Foss do not intend to abide by the declaration."
 
 
 [5]
 We also reject Sea-Land's argument that the Foss bid should be disregarded because it was not responsive to the Request. The concept of literal responsiveness to government solicitation is more properly found in the advertised procurement context. This procurement, however, was a negotiated one. The Defense Acquisition Regulations carefully distinguish between the two. Compare DAR Section II, 32 C.F.R. Part II (procurement by formal advertising) With DAR Section III, 32 C.F.R. Part III (procurement by negotiation). Not surprisingly, the concept of responsiveness is not found in the regulations concerned with negotiated procurements, which generally envision a more flexible approach