ELECTRO–NUCLEONICS, INC.,
Plaintiff,

v.

GOODYEAR AEROSPACE CORP.,
Defendant.

Civ. No. 80–113.

United States District Court,
D. New Jersey.

Feb. 19, 1980.

Connell, Foley & Geiser, Newark, N. J.,
by Adrian M. Foley, Jr., and Thomas S.
Cosma, Newark, N. J., for plaintiff.

Kirsten, Friedman & Cherin, by Harold
Friedman, Newark, N. J., Cahill, Gordon &

Reindel, by David R. Hyde, New York City, of counsel, for defendant.

## OPINION

BIUNNO, District Judge.

This suit is related to a project of the Department of Energy (DOE) to have constructed for it a plant intended for the production of fuel for use in the operation of electric generating plants. Because the parties are aware that the project data includes highly classified information, the entire record was sealed to avoid any unintentional disclosure of such information. In its discussion here, the court will use material already published generally, together with illustrative material which differs from the record material in actual tenor but sufficiently analogous to it for the purpose of analysis and decision. It is not necessary to deal with the exact numbers and other data as set out in the record. It is adequate to employ another set of numbers and data having the same function.

As has been described in technical articles for the layman, one of which is found at Tab 12 of Goodyear's appendix at the original hearing, the method used for the production of fuel to date, at least in this country, has been one of gaseous diffusion through a membrane. As has long been known, an isotope of the metallic element uranium, known as U–235, is useful for such fuel, while the common element, U–238, is not. The two numbers represent differences in atomic weight. In a compound, it will affect the molecular weight.

Both U–238 and U–235 are found in nature, but the percentage or concentration of the isotope as found is too small for the combination to be useful. Some process is needed to separate and remove some of the U–238, leaving a mixture of both U–238 and U–235 in which there is enough concentration of the isotope to make the mixture usable.

The article mentioned above observes that the gaseous diffusion process requires the use of large amounts of electrical energy. In the decades when such energy was plentiful and cheap, this feature was not of great significance when compared to the fact that the technology of the membrane diffusion process was known and reliable, while other potential processes had not been worked out.

With available electrical energy now becoming scarcer in comparison with demand, and with its cost increasing sharply, DOE has evidently made a judgmental evaluation that some other process should be selected and a processing plant built. The process selected is that of centrifuging the mixture of gases and achieving separation due to the difference in atomic weights. The principle is identical to that of the old cream separator. By spinning milk in a suitable container, the milk (which is denser) will move to the outer circumference by centrifugal force, thus displacing the cream (which is less dense) and forcing it to the center.

In the fuel process, the heavier gas containing U–238 will move to the outer circumference, while the lighter gas containing the isotope U–235 will be displaced and forced to the center.

The actual process, even in simplified form, is far more sophisticated than this, but what has been said is enough to understand the principle. The major advantage, no doubt apart from others, is that the electrical energy demands of the centrifuge process are a small fraction of those characteristic of the membrane diffusion process.

The court does not have before it, and it would probably not be useful if it did, the underlying data, factors and evaluations that led DOE to embark upon this project beyond what has been said. DOE's policy decision is not an issue here. The fact is that the decision was made, and the project has been launched and is under way.

The project is designed to culminate in the completion of a processing plant at a target date in the future. However, since the technology as applied is evidently new on a production level, the program is designed to proceed in two major steps. From what appears in the record, the inference is clear that DOE has already passed

through preliminary stages, such as laboratory operation of the process and probably small scale pilot plant operation, sufficiently for it to invite proposals by interested contractors to manufacture the machinery, equipment, buildings and other plant facilities according to specifications.

There is also a strong inference that since there has not been extensive (or perhaps any) experience in the function of manufacturing this special purpose machinery, DOE is contracting with three separate prime suppliers, each of whom is to produce some number of the same kind of units, more or less on the same time scale, independently of each other.

The units so manufactured will then be installed in a small production plant and operated. From this stage, DOE evidently expects to obtain information as to the manufacturing capabilities, quality and other characteristics of the three prime suppliers, including their comparative costs. This latter item evidently will be derived from the fact that the contracts for the first stage are on the basis of cost plus a fixed fee (i. e., the fee will not vary with the cost as finally experienced).

After the first small production plant has been built, with units made by all three of the prime suppliers, DOE will then take up the question of letting contracts for the manufacture of the larger number of units for the full production plant. At that time, and with the information and experience derived from the first stage production plant, DOE will decide whether to order the remaining units from only one of the three prime contractors or from more than one, or from all. That decision will involve complex considerations. Will it be better to have multiple sources of supply, or will any advantage so gained be outweighed by looking to a single source of supply whose performance was clearly superior and of lower cost? If multiple sources are to be used, will DOE be assured that parts and components made by one will be interchangeable with those made by others for long-term maintenance and repair purposes?

The question to be decided by DOE at that time will be not unlike that which would be faced if the program were to design and have built a motor vehicle of standard, uniform design and specifications, with initial contracts awarded to GM, Ford and Chrysler to each make a small production run, after which the cars produced by each would be put into actual use for evaluating their performance, reliability, efficiency, and so on, after which a full order would be placed with one, two or all three of the manufacturers.

All of the foregoing is background context for a clear understanding of the claims made here by Electro-Nucleonics (ENI), and evaluation of the record for deciding ENI's application for preliminary injunctive relief.

When DOE first published its request for proposals (RFP), a number of potential bidders obtained the documents to consider whether to make a submission. ENI was one of these, and initially gave thought to making a submission for possible selection as one of the three prime suppliers contemplated for the first stage. For whatever reason, it decided instead to solicit a number of other companies known or believed to be interested in making a proposal as a prime supplier, with the object of becoming a sub-contractor for some part of the entire work. It made its interest known to at least 3 of these. Of the 3, Goodyear evidently was the only one that indicated interest in entering into a "teaming agreement" whose ultimate object it was to designate ENI as a subcontractor for some segment of the work. As worked out between the parties, this was defined as the production of what will be called an upper subassembly of centrifuge units. Goodyear's proposal to DOE was thus to comprise the sum of its own production and that of ENI.

ENI submitted to Goodyear a number of proposals in respect to its proposed subcontract. In each one of the series, the aggregate estimate of ENI for its subcontract, composed of estimated cost plus fixed fee, was reduced. In the last one submitted, the lowest figure was shown. In discussions

between the parties, ENI indicated that it might be able to reduce the figure by $X during final negotiations. Goodyear so informed DOE, along with its own view that the subcontract amount probably could be negotiated for a reduction of $4X. The $X reduction was about 1% of the subcontract figure, while the $4X reduction was about 4%.

The record does not disclose what information DOE had for its evaluation. It may have its own engineers and cost estimators. It may have had comparable cost estimates from the other two proposed prime suppliers (whose data is evidently not disclosed outside DOE). In any event, whatever the information was, DOE took the position that the figures on ENI's subcontract were too high, and asked Goodyear to prepare an estimate of cost to compare the figures for subcontracting the upper subassemblies to ENI against the figures for Goodyear performing the same work itself (in-house). That comparison reflected a potential saving for the upper subassemblies of the order of some 40%. DOE then indicated that it could not approve ENI as a subcontractor. Goodyear then so informed ENI, and ENI proposed to Goodyear that it would accept a subcontract at the estimated in-house Goodyear cost, and also waive the fixed fee. This proposed solution was not formally relayed to DOE by Goodyear, although DOE has been made fully aware of the circumstances through delivery to it of all the papers then on file here as of the time the order to show cause was issued, at the court's suggestion that DOE might wish to consider an application to intervene, or at least appear as *amicus curiae*.

As matters stand, DOE has entered into a contract with Goodyear as one of the 3 prime suppliers, which contemplates that Goodyear will itself manufacture the upper subassemblies, and DOE has not approved ENI as a subcontractor, a specified precondition in the main contract before Goodyear may enter into a subcontract.

Orders for materials, supplies and the like, plant preparation, hiring of engineers and labor, and so on, are already under way at Goodyear.

In this suit, which is in 3 counts, ENI seeks a variety of forms of relief. On the first count, ENI seeks (aside from temporary restraints, which were denied):

1. preliminary injunction restraining Goodyear from negotiating or communicating with DOE in respect to ENI unless and until Goodyear employs ENI as its prime [sic] subcontractor for the first stage;

2. permanently restraining Goodyear from

    (a) terminating the teaming agreement and from refusing to perform it;

    (b) naming anyone, including itself, as the person designated to manufacture the upper subassemblies;

    (c) the same conduct (i. e., negotiating or communicating with DOE) as sought on the preliminary injunction;

3. specific enforcement of the teaming agreement by requiring Goodyear to negotiate with ENI in good faith and to award ENI a subcontract with terms and conditions comparable to and consistent with those in the prime contract, including part of the fixed fee and the same termination clauses.

4. compensatory and punitive damages.

The remedies sought in Counts 2 and 3 essentially track those of Count 1.

After review of the very thorough presentation of evidential material (depositions, affidavits and exhibits gathered by the parties most expeditiously and with commendable cooperation) the court concludes that the application for preliminary relief should be denied.

■ The controlling decisions in this circuit establish a series of factors to be considered. These are:

1. Does it appear that there is a reasonable likelihood of success on the merits?

2. Is the claimed damage of a nature such as to be irreparable? This is not related to the magnitude of the claimed damage, but rather to the underlying question whether money damages provide an adequate remedy at law.

3. What are the respective burdens on one party or the other if the preliminary relief be granted?

4. How will the interests of others—third persons—be affected?

5. What is the public interest, and how will it be affected?

6. If the preliminary relief is granted, what security for costs and damages should be set, under F.R.Civ.P. 65(c) if it turns out that the preliminary relief was improvidently granted?

*Delaware River, etc. v. Transamerican, etc.*, 501 F.2d 917 (CA 3, 1974) lists four of these factors, numbers 1, 2, 4 and 5. Item 3 is the long-recognized "balancing of the equities" test which is doubtless included in one way or another in the other tests. Item 6 is required by the Rules, and is applicable though rarely discussed in conjunction with the other tests.

See, also, *U. S. v. Spectro Foods Corp.*, 544 F.2d 1175 (CA 3, 1976) (referring to the sparing exercise of a preliminary injunction especially where the provisions are mandatory); *Doe v. Colantti*, 592 F.2d 704 (CA 3, 1979); *A.O. Smith v. F.T.C.*, 530 F.2d 515 (CA 3, 1976); *Constructor's Ass'n v. Kreps*, 573 F.2d 811 (CA 3, 1978).

■ In a case involving contract awards by a procurement official of a federal agency, even when the agency was a party to the suit, the rule is that a district court may not substitute its judgment for that of the contracting officer so long as the officer has any rational basis for his contract award. *Sea-Land Service v. Brown*, 600 F.2d 429 (CA 3, 1979). In the present case, ENI says it does not now challenge the DOE decision not to approve ENI as a subcontractor, nor could it, if only for the fact that DOE is not a party, quite aside from the question, not decided here, whether there would be jurisdiction in this court. For a discussion of the jurisdictional aspect, see *Isothermics v. U.S. Energy etc. Agency*, 434 F.Supp. 1115 (D.N.J.1977) (DOE has since supplanted the ERDA).

It is not necessary to make any findings at this stage in respect to items 1, 2 and 3, *supra*. It is sufficient to assume that ENI has satisfied those tests, because tests 4, 5 and 6 are clearly not satisfied here. These are discussed separately.

*Interests of others (third persons).* For the purposes of evaluating this item, isolated from others, the situation and relationships are the same as though an owner had entered into a contract with a builder to put up a hotel or a shopping center, on terms that allowed the builder to subcontract the plumbing, roofing, heating and air-conditioning, etc., so long as the owner first approved the subcontractor selected. Such a provision is common and usual, and it is included in the contract between DOE (owner) and builder (Goodyear). Such provisions are recognized and commonly used because the owner is the party having the ultimate interest in having whatever is to be built finished and delivered in accordance with plans and specifications. In passing on a request to approve a subcontractor, the owner may consider many factors. Does the subcontractor possess the skills to perform the work as called for? Does he have the capacity to undertake work of the magnitude involved? Is he likely to be able to proceed expeditiously in coordination with the work of others? Does he have the financial resources which performance will require? And so on. This is a decision for the owner to make, and if he decides to reject a proposed subcontractor he cannot have his right to pass on the question effectively taken away by a preliminary injunction in a law suit between the subcontractor and the builder to which he is not a party. His interests and his equity are primary and superior to those of all other parties. If a case can be made on any theory that the subcontract should be allowed, or that the subcontract work should be delayed while the issue is litigated, the owner is obviously an indispensible party. The case cannot proceed without him so far as injunctions are concerned.

The proposed subcontractor may have a litigable claim against the builder as the result of transactions between them, but the interests and equity of the owner are so clearly superior as to bar injunctive relief,

whether prohibitory or mandatory, against the builder in any way that would jeopardize the owner's interest in having his building finished on time and according to plans and specifications.

In this sense, there is a false issue here on the preliminary injunction aspect arising out of ENI's proposal to accept a subcontract at an estimated cost the same as Goodyear's in-house figure, and to waive any fixed fee. Such a proposal raises new questions for the owner. Can ENI actually be expected to perform at this sharply lower figure? If there be doubt that it can, the entire contract is at risk. The units without the upper subassemblies are presumably useless. They would be like an engine block without a cylinder head. These are not "stock items" that can be purchased "off the shelf". A new technology is involved, and all concerned will be involved in a certain amount of on-the-job training during the first stage.

DOE has primary jurisdiction to address the question whether ENI should be approved as a subcontractor at its sharply reduced figure. This is a matter of jurisdiction, and does not even reach the question of review of administrative determinations.

■ In its briefs, ENI suggests that the mildest form of relief, least likely to invade the primary jurisdiction of DOE, is to oblige Goodyear to submit ENI's new proposal and make a good faith effort to obtain DOE's approval. Appealing as this suggestion may be, the court cannot accept it. As it is further detailed in ENI's supplemental memorandum, this approach contemplates that the parties arrive at a mutually agreed upon dollar amount for submission as the subcontract price to ENI for the upper subassembly along with Goodyear's recommendation for DOE's approval, plus a provision for Goodyear to provide interim funding to ENI so that ENI may commence work on the upper subassembly pending DOE approval; and finally that Goodyear be restrained from proceeding to manufacture the upper subassembly itself.

In the first place, such provisions would not be proper for an injunctive order, which is to be specific in its terms and must describe the act or acts sought to be restrained. These notions are reflected by F.R.Civ.P. 65(d), and are not met by directions to arrive at "mutually agreed upon dollar amounts", or by a direction to provide "interim funding" in an amount "agreed upon". If an order of this kind were entered, Goodyear would have nothing in the order to guide it, with the assistance of counsel, on the question whether its future conduct is in compliance with or in violation of the order. It may be that the parties may be able to arrive at some such agreements, but if so it would be because they agreed. A court cannot order an agreement to be reached; it could not rationally enforce the order should the parties not agree.

In the second place, the suggestion that Goodyear be prevented from proceeding to manufacture itself the upper subassemblies would not only amount to a direction not to perform its contract with DOE, but it would have considerable tendency to interfere with DOE's planned schedule.

■ *The public interest aspect.* Independently of the discussion above, the fact is clear that the DOE project is heavily infused with public interest considerations. The project is highly sophisticated and charged with novel technology. The scope of the proposed subcontract deals with a subassembly which is the upper portion of the centrifuge unit, without which the entire centrifuge unit would be useless.

Delay in this aspect of the first stage of the program carries too much risk of causing further delay down the line and puts in prejudice the targeted completion of the final plant.

The problems faced in achieving manageable levels of national energy independence, and the importance of having no avoidable obstacle stand in the way are matters of public interest that far outweigh whatever competing considerations there may be in ENI's favor. This is not merely a matter of deciding which carrier's tariff will move

military goods between the West Coast and Alaska at a more economical cost to the public, as in *Sea-Land v. Brown, supra*. In that case, there was no question that either of the competing carriers had the capability to move the goods on schedule. The dispute centered on procurement procedures and the propriety of allowing tariff submissions on different methods of calculation. Nor was any delay involved. One or the other carrier would be moving the goods as scheduled, with or without an injunction.

Here, any restraint on Goodyear is bound to disrupt coordination schedules and cause delay. Achievement of target dates may prove difficult even without judicial interference, and the public interest by itself is compelling ground for denial of the relief sought.

■ *Security*. Rule 65(c) mandates the posting of security in an amount judged to be sufficient to cover costs plus damages sustained in the event it turns out that the preliminary relief should not have been granted.

In principle, this is directed to the form of relief, and not to the different question whether ENI has some claim it can establish for some other kind of relief. To illustrate: if at the end ENI be found entitled to monetary damages but not to equitable relief, and if a preliminary injunction has meanwhile caused damage by reason of delay, the security must be sufficient to assure that the damage caused by delay can be paid.

ENI's proposal is that the security be in a nominal amount. If it had persuaded the court that preliminary injunctive relief be granted on all other considerations, the court could not agree. Rather, a. tailored measure of security in the circumstances here would be the difference between ENI's last estimate of cost plus fixed fee, as submitted to DOE and rejected by it as too high, and the new proposal, some 40% lower, for which ENI now says it will perform without any fee.

This measure is sound because the price is a *cost* price. If ENI were approved on the lower figure, but incurred actual costs at the higher one, Goodyear would be at risk for the difference, since DOE might well disallow ENI's higher actual cost.

## CONCLUSION

■ For each and all of the considerations discussed above, the application for preliminary injunction is denied. The denial in no way stands to preclude ENI, Goodyear and DOE from developing some solution of the dispute of their own design, short of judicial adjudication, if they can.

Submit order accordingly, referring to this opinion as the basis for the order.