**SACO DEFENSE SYSTEM DIVISION, MAREMONT CORPORATION and Saco Defense, Inc., Plaintiffs,**

v.

**Casper WEINBERGER, Secretary, U.S. Department of Defense and John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants.**

**Civ. No. 85–0082–P.**

United States District Court, D. Maine.

April 8, 1985.

448

Josephine L. Ursini, Leigh S. Ratiner, Dickson Shapiro & Morin, Washington, D.C., Ralph I. Lancaster, Pierce Atwood, et al., Portland, Me., for plaintiffs.

Kevin A. Gaynor, Asst. U.S. Atty., Portland, Me., Lt. Col. Howard Curtis, Headquarters, Dept. of the Army, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

GENE CARTER, District Judge.

### I. *Background*

Plaintiffs have filed a Complaint for Declaratory and Injunctive Relief alleging that defendants acted in violation of Federal Acquisition Regulations in evaluating their bid for the contract to produce 9mm hand guns for the Army. The Complaint seeks preliminary and permanent injunctive relief. Plaintiffs have also filed with the Complaint a Motion for Expedited Discovery and a Motion for a Temporary Restraining Order. The Court declined to act on the motion for a Temporary Restraining Order *ex parte,* and notice was given to the defendants and a hearing held on the pending motions on April 4, 1985. The Court will, therefore, treat the motion as one for preliminary injunction pursuant to Fed.R. Civ.P. 65(a). *Dilworth v. Riner,* 343 F.2d 226, 229 (5th Cir.1965). The defendants had filed, and have now withdrawn, a Motion to Transfer Venue in this case to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a).

The Army has announced that the contract will be awarded to Beretta U.S.A. Corporation. Counsel for the Army indicated at hearing that the Army intended to award the contract on the day following the hearing, April 5, 1985. At the request of the Court, the Army has agreed to withhold the actual award of the contract until 5:00 p.m. on April 9, 1985 in order to give this Court an opportunity to decide the plaintiffs' request for preliminary injunctive relief. Before filing this action plaintiffs had filed a protest of the bidding process with the General Accounting Office. That protest was dismissed as untimely filed.

The plaintiffs assert that the Army, in violation of Federal Acquisition Regulation 15.610(c)(3) & (4), incorrectly applied cost evaluation factors submitted by Saco, without attempting to resolve uncertainties concerning Saco's technical proposal or to resolve any suspected mistakes in Saco's bid by calling them to Saco's attention. Plaintiffs also allege that the defendants, in violation of Federal Acquisition Regulation 15.606, knew of modifications in their requirements for the handgun but did not issue an amendment to the solicitation and allow all bidders to submit new or amended proposals on the basis of the revised requirements.

### II. *Preliminary Injunctive Relief*

#### A.

In order to prevail on its request for preliminary injunctive relief, the plaintiffs must satisfy four essential requirements. This Court has had occasion in the past to set out succinctly those requirements in *UV Industries, Inc. v. Posner,* 466 F.Supp. 1251 (D.Me.1979) (per Gignoux, J.):

It is well settled law that, in the ordinary case, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The court must find: (1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the motion.

*Id.* at 1255; *see also Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979) (per Gignoux, J.).

This formulation of these criteria has been approved by the United States Court of Appeals for the First Circuit. *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (*quoting Women's Community Health Center, Inc.*); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir.1969); *Automatic Radio Manufacturing Co., Inc. v. Ford Motor Co.*, 390 F.2d 113 (1st Cir. 1968), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). This Court has indicated in the recent past the continuing applicability of these requirements to a request for temporary injunctive relief. *Stanton v. Brunswick School Department*, 577 F.Supp. 1560 (D.Me.1984) (per Carter, J.); *Sheck v. Baileyville School Committee*, 530 F.Supp. 679 (D.Me.1982) (per Cyr, C.J.).

■ Further, it is well established general law with respect to equitable injunctive relief that the Court is to bear constantly in mind that an "[i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case." *Plain Dealer Publishing Co. v. Cleveland Type. Union #53*, 520 F.2d 1220, 1230 (6th Cir.1975), *cert. denied*, 428 U.S. 909, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1977). The Court's hesitation to utilize so drastic an aspect of its prerogative should be heightened where the relief requested is only temporary in nature. *Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037, 1047 (C.D.Cal.1977).

### B.

■ When injunctive relief is sought in the area of Government procurement contracts, the Court must apply these precepts of judicial restraint more stringently, especially with respect to the factor of the likelihood of plaintiffs' success on the merits. *Princeton Combustion Research Laboratories, Inc. v. McCarthy*, 674 F.2d 1016, 1019 (3d Cir.1982). In *Princeton Combustion Research Laboratories* the Court noted that in spite of the fact that the bidder has a legitimate interest in being treated fairly under the applicable statutes and regulations, "the strong public interest in efficient procurement and cost minimization mandates that the procurement contract not be set aside at the behest of a single 'disappointed bidder' unless the awarding agency's decision was irrational or clearly illegal." *Id.* The district court is not to substitute its judgment for that of the contracting authority and "should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision." *Id.* (*quoting Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir.1979). In the effort to demonstrate a likelihood of success on the merits the plaintiffs must overcome the "presumption of administrative regularity." *See, id.*, at 1021.

■ Even when the Court concludes that a showing of irrationality in the decision has been made, "prudent judicial discretion may still refuse declaratory or injunctive relief because of overriding public interest." *Sea-Land*, 600 F.2d at 434; *Acme of Precision Surgical Co., Inc. v. Weinberger*, 580 F.Supp. 490, 503 (E.D.Penn. 1984). In the exercise of that discretion the district court is to be guided by the balancing of three factors: (1) the practical considerations of efficient procurement of supplies for continuing government operations; (2) the public interest in avoiding excessive costs; and (3) the bidder's entitlement to fair treatment through adherence to statutes and regulations. *Id.* In performing this weighing judgment, the Court must keep the following admonition constantly in mind:

> The court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis. This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation, but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated

circumstances of individual procurements.... If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations. Otherwise the courts would become the forum for all manner of objections to procurement decisions—objections that counsel can readily relate to the language of some provision or other in some procurement regulation—and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules.

*M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301–02 (D.C.Cir.1971).

■ The controlling principle is that while contracting officers are not free to act in disregard of the provisions of pertinent statutes, rules and regulations, they are entitled to exercise discretion upon a broad range of issues which confront them, including "considerations of price, judgment, skill, ability, capacity and integrity" in the solicitation and evaluation of business proposals from those persons and firms with whom the Government chooses to enter into contracts. *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1277 (5th Cir.1978) (*quoting Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 869 n. 10 (D.C.Cir.1970)).

■ To put it succinctly, the question before the Court is *not* whether the contracting authority's decision to award the contract was the right policy decision in the view of this Court. Rather, the Court must determine "whether or not the contracting officer's decision was 'the result of a *considered process,* rather than an arbitrary and capricious choice based on factors lacking *any* intrinsic rational basis or relationship to the questions at issue.'" *Keene Corp. v. United States,* 584 F.Supp. 1394, 1401 (D.Del.1984) (emphasis in original) (*quoting Kinnett Dairies,* 580 F.2d at 1277).

## III. The Plaintiffs' Likelihood of Success On the Merits

Plaintiffs level their challenge at three aspects of the defendants' procurement procedure: (1) the requirement of a 10% quantity factor for spare parts; (2) the possible double-counting by the Army of spare parts causing a misevaluation of the costs of each bidder's weapon; and (3) the Army's failure to seek new bids when they knew that the requirements for the gun to be produced would be different from those on which best and final offers were made. The Court finds that plaintiffs have not made an adequate showing that any of the three alleged errors in the procurement process rendered the award of the contract irrational or clearly illegal.

### A.

Plaintiffs argue that a 10% quantity factor for spare parts bears no relationship to the actual frequency with which individual parts break and need replacement and is, therefore, an irrational basis for the pricing of spare parts. The Court notes that plaintiffs have submitted no evidence that a 10%, across-the-board quantity figure for spare parts is out of line with average frequencies of repair. The complaint alleges that choice of the 10% figure was particularly erroneous with respect to the frame subassembly, for which a spare part price was requested. According to the affidavit of Michael Derr, however, the frame assembly was not one of the spare parts included in the spare parts cost adjustment.

■ Counsel for the Army explained that a 10% factor was selected because it was impossible to tell in advance specifically what the spare parts needs would be since they differ from weapon to weapon. The decision of how best to assess spare parts requirements and costs, given the difference in weapons, is clearly a matter particularly within the expertise of the contracting officer, *see, M. Steinthal & Co.,* 455 F.2d at 1301, and the reviewing court should not succumb to any temptation to substitute its own judgment for that of the contracting officer. *Sea-Land Service,*

*Inc. v. Brown,* 600 F.2d at 435 (3d Cir. 1979). There has been no showing that the Army's use of the 10% factor lacked a rational basis. Also, since, on the record here made, the 10% factor was applied to both bidders and was known to all in advance, its application is not unfair.

### B.

Next plaintiffs assert that the Army double-counted some spare parts in arriving at its adjusted cost for the weapon because certain individual parts were also included in subassemblies. Specifically, plaintiffs allege that the Army erroneously "double count[ed] the frames and slides assemblies, so the inevitable result would be an award to Beretta." Complaint, ¶ 32. Plaintiffs contend that such double-counting results in cost distortion because if the parts were used in the form of assemblies, they would not be used individually. Plaintiffs point out that in its Instructions, Conditions and Notices to Offerors, the Army stated that it "reserves the right to use *either* the subassembly prices *or* the piece part prices." Complaint, Ex. K, § (C)(3). (Emphasis added.)

The affidavit of Michael Derr makes it clear that neither the frame nor slide assemblies specifically complained of by plaintiffs were included in the list of spare parts on which cost was evaluated. Derr Affidavit, ¶ 4 and attachments. It is also clear from that affidavit that certain other assemblies and their component parts *both* were included, as plaintiffs contend, on the list of spare parts from which the adjusted price of the weapon was determined, e.g., the hammer, hammer strut assembly and hammer assembly are all included, as are the slide with sights and individual front and rear sights. Mr. Derr, the chairman of the cost subteam, explained that the assemblies and their components were, in some limited respect, both included because the

Army in fact planned on purchasing *both* the assemblies and their components *as spare parts* to be used in different repair situations:

The Hammer Assembly, the Hammer Strut Assembly, and the Slide with Sights were included in the spare parts adjustment because it was not economical or practical to buy the parts that comprise these items and assemble them in the field when they were readily available as assemblies. The same consideration would apply to the inclusion of a complete magazine as opposed to the component parts thereof. Additional Front and Rear Sights, which are also a part of the Slide with Sights, were included in Exhibit A because it is not economical to replace a complete Slide because of a broken Front or Rear Sight.

Derr Affidavit, ¶ 4.

Since the Army wants to buy both assemblies and components as spare parts, no improper double-counting as alleged by plaintiffs occurred. Neither does it appear that there were any uncertainties or suspected mistakes in plaintiffs' bid which defendants should have resolved under Federal Acquisition Regulations 15.-610(c)(3) & (4)[1] before evaluating the cost of each bidder's weapon.

The Instructions to Bidders did reserve to defendants the right to use either the subassembly prices or the piece part prices, and instead they used both with respect to a very restricted number of parts. The Court fails to see, however, how any harm resulted from the use of both prices in the circumstances of this case where both pieces of equipment were desired, rather than just one or the other. The Government determined which spare parts it would stock and issue, and the same cost evaluation procedures were applied, so far as the record shows, to each

---

1. Regulation 15.610(c)(3) & (4) provides in pertinent part:

  (c) The contracting officer shall—

    (3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

    (4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offeror's proposals or the evaluation process.

bidder's proposal. The restrictive discretion of the Court extends "to determination by the [contracting] agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements." *M. Steinthal & Co.*, 455 F.2d at 1301. This minor deviation from the language of the Instructions to Bidders, if it be that, cannot be found to be a "clear illegality," especially when viewed in the context of the defendants' policy decision that in some limited respects it would be necessary to purchase individual parts, as well as subassemblies, as spares. Further, even if clear illegality were shown, the bidder's interest in enforcing a precise reading in all respects of the language of the Invitation, where no significant harm is demonstrated, cannot be said to outweigh the public interest in having the Government's procurement decision expeditiously finalized. *Sea-Land Service*, 600 F.2d at 434. Such a requirement would do little good to the "disappointed bidder" and would be of no "measurable benefit to the public." *Id.*

### C.

Finally, the plaintiffs argue that the Army violated their Acquisition Regulation 15.606 by informing plaintiffs by letter, after submission of their best and final offer, that there were "hardware changes and weak points [which] would have to be corrected or implemented after award" if plaintiffs won the bid. The letter went on to state specifically that "these hardware changes and weak points are to have no bearing or impact on solicitation DAAA09–84–R–8506 or the pending best and final offer." Beretta received a similar post-bid letter.

Federal Acquisition Regulation 15.606 provides:

(a) When, either before or after receipt of proposals, the Government changes, relaxes, increases, or otherwise modifies its requirements, the contracting officer shall issue a written amendment to the solicitation....

....

(c) If the proposal considered to be most advantageous to the Government (as determined according to the established evaluation criteria) involves a departure from the stated requirements, the contracting officer shall provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements....

48 C.F.R. § 15.610(c)(3) & (4).

Three affidavits submitted by defendants address the allegation that the Army changed the requirements for the contract weapon without allowing plaintiffs to amend their bid accordingly. The affidavit of Brian Schmidt, the Army's Contract Specialist responsible for the request for proposals in this case, states that "[t]his letter did not purport to change any performance characteristics but merely cited *small factors* noted by the Human Engineering Laboratory during the performance testing." Schmidt Affidavit, ¶ 3 (emphasis added). The anonymous affidavit of the Chairman of the Source Selection Advisory Council states that the letter "delineat[ed] *minor changes* to be made in the event of possible award." Anonymous Affidavit, ¶ 4. The affidavit of Lt. Col. Michael Roddy, III states that both candidate weapons fully met the requirements and could be purchased as tested. "At no time were the requirements changed." Roddy Affidavit, ¶ 4. All three affidavits emphatically state that the evaluation was made on the basis of the originally stated requirements, and that the changes mentioned in the post-bid letter had no bearing on the selection of the winning proposal.

██ In the face of three sworn affidavits stating that the proposed changes were not a factor in the evaluation process, the Court cannot credit plaintiffs' bald assertion that the changes must have been a factor because press releases have indicated that durability of the Beretta weapon had been one of its important features. At this stage of the proceedings, the affidavits establish to the Court's satisfaction that the proposal considered most advantageous to the Government did not involve a depar-

ture from the stated requirements, necessitating an opportunity for resubmission of bids by all offerors under 48 C.F.R. § 15.-606. The Army's reading of the regulation is to have the benefit of judicial deference. *M. Steinthal & Co.*, 455 F.2d at 1301.

■ Plaintiffs also argue that new bids were in order because the changes would have affected the price of the weapon, and cost had been the major factor in the choice of the Beretta weapon. Plaintiffs assert that the changes requested by the post-bid letter were more significant than those set forth in amendment three to the request for proposals, upon which the best and final offers were based. The regulation says that an amendment to the solicitation shall be issued when the Government changes its requirements. Again, although plaintiffs assert that the referenced hardware changes and weak points are significant and should be considered "requirements," plaintiffs have submitted no evidence of how the changes are significant. They could, for example, have shown specifically the changes in cost expected to be caused by such changes. Defendants have unequivocally stated that the requested changes are considered by them to be "minor." They are "small factors" which do not rise to the level of requirements which would, under the regulations, require submission of new bids. As the Court has previously stated, its review in this area is limited. It is not within the Court's purview to tell the Army what the requirements should be on which it should base its evaluation. *Prudential Maryland Joint Venture Co. v. Lehman*, 590 F.Supp. 1390, 1404 (D.D.C.1984). Plaintiffs have made no showing that defendants in fact adopted other requirements. Since it appears on the record that both competitors were judged on the same requirements and by the same procedure, the Court does not find legally inappropriate the Army's suggestion that other minor changes might have to be made after award. On the basis of the record before it, the Court finds it unlikely, for any of the reasons alleged, that plaintiffs will succeed in proving that the award of the handgun contract to Be-

retta rather than to plaintiffs was not rationally based.

### D.

Plaintiffs also vigorously suggest that "political intrigue" was a motivating cause of the award of the handgun contract to Beretta U.S.A. This suggestion is premised upon the temporal confluence of the Army's decision favoring Beretta and (1) a meeting of the Chairman of the National Security Council with Italian Defense Minister Spadolini, closely followed by the announcement of the award to Beretta U.S.A.; (2) a succeeding visit in Washington between Minister Spadolini and President Reagan; (3) a personal telephone call by Defense Secretary Weinberger to Minister Spadolini "to congratulate the latter on the award of the contract to Beretta," Complaint ¶ 26; and (4) Minister Spadolini's ongoing "vocal concern about the trade imbalance," Complaint ¶ 25, between the United States and Italy. In an effort to give heightened circumstantial probative force to these events, plaintiffs point to a September 1981 Memorandum setting forth the recommendation of the Joint Service Small Arms Program Management Committee that the Beretta weapon be acquired "by *sole source acquisition.*" Complaint, ¶ 24 (emphasis in original).

■ Although intriguing, this artfully constructed predicate for the suggestion that political or diplomatic goals and motives entered into the evaluative process is wholly circumstantial in its basis and, in the view of this Court, of no demonstrative probative force. The Court has concluded that plaintiffs have shown no legal impropriety or irrationality in the Army selection of Beretta to receive the award. This finding is a sufficient answer to the airy circumstantiality of a series of events, which are easily justified as serving other legitimate purposes, and whose allegedly causative connection to the awarding of the contract is not supported by any convincing evidence. The plaintiffs claim that, if offered the opportunity, they might "turn

up" some evidence in discovery supportive of a causative relation. On such a bare and speculative showing, allowance of that opportunity is not consistent with the public interest in having a governmental decision derived by a legally sufficient process executed, undelayed by unfounded suspicion. So long as the activities of high officials of the two governments are not shown to touch upon the legal propriety of the award, they are beyond the pale of this Court's review.

### E.

Finally, the plaintiffs argue that there is shown legitimate question as to the propriety of the award because plaintiffs know that the unit costs of their proposed weapon is lower than that affixed by the Army to the Beretta handgun. They assert that this must be so because the element of cost is weighted to make up at least 50% of the basis of the award.

█ If it be assumed that both of these propositions are correct, they do not compel the conclusion that the Army's decision issued in any improper way. First, it is beyond any doubt that the cost determination in respect to each competing weapon is not a matter of simple arithmetic. It involves complex questions of evaluation of a myriad of technical questions, compounded in their intricacy by policy considerations concerning the contemplated life, utilization and efficacy of the selected weapon. All of these issues are properly committed to the exclusive authority and expertise of the contracting agency. *See M. Steinthal & Co.*, 455 F.2d at 1301. In policy matters of such complexity and of generically great moment, the Court may not intrude, for to do so will create by judicial *fiat* a condition in which the most important and urgent of governmental affairs may be conducted only by lawsuit. Whatever may be the majesty and utility of the legal process, its abilities are insufficient to effectively undertake activities that smack of the general governance of the nation.

Second, however much weight is ascribed to cost, other factors too have weight in the determination of the award. The determination of the appropriate weight to be given all of the factors in the final equation is again a matter of varied expertise and policy considerations committed to the judgment of the contracting agency. How those factors are to be set off against each other and ultimately against unit or total contract cost is for the agency to determine. The record here is devoid of any evidence from which those judgments, as made in this case, can even be known, much less critically evaluated for their reasonableness. Here the Court does not even know the extent of any per item cost margin that may exist between the two weapons in question. Absent that data, it would be impossible for the Court to be critical of the agency's rational process in melding the various procurement considerations into a final evaluation.

Thus, the Court is without either the legal authority or the evidentiary resources to second-guess the agency in respect to this critical aspect of its procurement decision.

### IV. *Conclusion*

█ The Court being fully satisfied that the plaintiffs have failed to show a likelihood of prevailing on the merits of their case, there is no need for extended discussion of the remaining three criteria for preliminary injunctive relief. As the Court stated in *Princeton Combustion Research Laboratories:*

> [O]nce the district court, having considered allegations that the agency's decision lacked sufficient factual basis, was tainted by procedural irregularities, and so on, nevertheless determines that an agency's procurement decision is rational, its inquiry is at an end. The district court must deny the motion for a preliminary injunction, and may not go on to engage in a balancing of the three factors specified in *Sea-Land.*

*Princeton Combustion Research Laboratories,* 674 F.2d at 1022.

Accordingly, the entry will be:

(1) Plaintiffs' Motion for a Preliminary Injunction is hereby DENIED; and

(2) Plaintiffs' Motion for Leave to Request Discovery and for Expedited Discovery is hereby GRANTED.

SO ORDERED.