ACME OF PRECISION SURGICAL CO., INC. t/a A & P Surgical Co., Inc.; Columbia Surgical Instrument, Inc.

v.

Caspar W. WEINBERGER, Secretary of Defense; Admiral Eugene A. Grinstead; General L.A. Brooks; Col. Neil Bischoff; Lt. Col. James Ostrander; William Di Lauro; Surgical Instrument Co. of America; American Medical Instrument Corporation; Marbex, Inc.

and

Joseph Bak; Joseph Calabro.

Civ. A. No. 83–1704.

United States District Court,
E.D. Pennsylvania.

Feb. 7, 1984.

Guillermo L. Bosch, Philadelphia, Pa., for plaintiffs.

C.A. McCrae, Greenup, Ky., for Marbex, Inc.

Edwin A. McCabe, Boston, Mass., for American Medical Instrument Corp.

Leon M. Robinson, Trenton, N.J., for Surgical Instrument Co. of America.

David L. Hyman, Joan K. Garner, Asst. U.S. Attys., Philadelphia, Pa., for Government Defendants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

Plaintiffs filed this action for injunctive and declaratory relief challenging certain solicitations issued by The Defense Personnel Support Center ("DPSC") for surgical instruments. Plaintiffs assert that these surgical instruments, end items which were articles of specialty metals, were awarded or were going to be awarded to other bidders in violation of statutory law, namely the Department of Defense Appropriations Act, Pub.L. No. 97–114, § 723, 95 Stat. 1565 (1981), the Joint Resolution making continuing appropriations for fiscal year 1983, P.L. No. 97–276, 96 Stat. 1186 (1982), and the Joint Resolution making further continuing appropriations for fiscal year 1983, P.L. No. 97–377, 96 Stat. 1830 (1982).

The gravamen of plaintiffs' contentions is that DPSC's reliance on Defense Acquisition Regulation 6–302, 32 C.F.R. § 6–302 (1982) in making its procurement decisions is contrary to the so-called "Buy American" provisions of the appropriations act and the subsequent joint resolutions. Specifically, plaintiff bidders contend that the "Buy American" provisions require that all articles of "specialty metals" purchased by "appropriated funds" must be manufactured *entirely* in the United States, and not just *"melted"* in the United States as is permitted in Defense Acquisition Regulation 6–302.

The parties have agreed to the consolidation of the hearing on plaintiffs' motion for preliminary injunctive relief with the trial on the merits pursuant to F.R.CIV.P. 65(a)(2), and have filed a comprehensive stipulation of facts to that end. *See* Docket Entry No. 37. Presently pending before the Court are the following motions: (1) Government Defendants' Motion To Dismiss Or, In The Alternative, To Transfer; (2) Motion Of Defendant Surgical Instrument Co. Of America To Dismiss, Or In The Alternative, To Transfer; (3) Plaintiffs' Motion For Preliminary Injunction And Summary Judgment; (4) Cross-Motions For Partial Summary Judgment; (5) Motion Of Defendant Marbex, Inc. To Compel Discovery; (6) Motion Of Defendant Surgical Instrument Co. Of America To Waive Retention Of Local Counsel; (7) Motion Of Defendant Marbex, Inc. For Second Extension Of Time.

## I. FACTUAL BACKGROUND

Because the parties stipulated to "the trial of the action on the merits [being] advanced and consolidated with the hearing of the application [for a preliminary injunction]" pursuant to F.R.CIV.P. 65(a)(2), the Court makes the following findings of fact (F.R.CIV.P. 52), all of which are undisputed (*see* Docket Entry No. 37):

1. The Plaintiff, Acme of Precision Surgical Co. t/a A & P Surgical Instrument Co., Inc. ("A & P") is a New Jersey corporation with its principal place of business located at 485 South 21st Street, Irvington, NJ 07111; the Plaintiff Columbia Surgical Instrument, Inc. ("Columbia") is a New York corporation with its principal place of business located at 118 Sanford Street, Brooklyn, NY 11205.

2. The Plaintiffs are manufacturers of surgical instruments of various types, including the surgical instruments which were being procured by the various solicitations described hereinafter. The Plaintiffs are both small businesses as defined in the Small Business Act, 15 U.S.C. 632, and its implementing regulations, 13 C.F.R. § 121.3 *et seq.*

3. Each of the individual Defendants is an officer or employee of the United States, or an agency thereof, acting in his official capacity or under color of legal authority. This is not an action concerning real property.

4. The Defendant Caspar W. Weinberger is the Secretary of Defense and is charged with the responsibility of all services, components, agencies, units, and personnel of the Department of Defense ("DOD").

5. The Defendant Admiral Eugene A. Grinstead is the Director of the Defense Logistics Agency ("DLA"), which is an agency of DOD, and is charged with the responsibility for all components, agencies, units and personnel of DLA.

6. The Defendant General L.A. Brooks is the Commander of the Defense Personnel Support Center, 2800 South 20th Street, Philadelphia, Pennsylvania ("DPSC"), which is a field activity of DLA, and is charged with the responsibility for all components, units, and personnel of DPSC.

7. The Defendant Col. Neil Bischoff is the Director of the Medical Directorate of DPSC ("DPSC, Medical") and is charged with the responsibility for all components, units and personnel of DPSC responsible for the procurement of medical items.

8. The Defendant Lieutenant Colonel James Ostrander is the Branch Chief, Central Contracts Branch Medical Directorate DPSC, and supervises procurement personnel of the Central Contracts Branch DPSC including its contracting officers.

9. The Defendant William Di Lauro and Joseph Bak and Joseph Calabro [1] are the contracting officers with DPSC Medical on those certain solicitations more fully described below and are specifically charged with the responsibility for all acts and omissions taken in connection with the said solicitations.

10. The Defendant Surgical Instrument Corporation of America ("Sicoa") is a Delaware Corporation with its principal place of business located at 469 Jane Street, Ft. Lee, New Jersey 07024; the Defendant Marbex, Inc. ("Marbex") is an Ohio corporation with its principal place of business located at Room 627, National Bank Bldg., Portsmouth, Ohio 45652; the Defendant American Medical Instrument Corporation ("Amico") is a New York corporation with its principal place of business located at 133–14 39th Avenue, Flushing, New York 11354, and is a subsidiary of Vernitron Corporation.

11. The Defendants identified above in Paragraph 10 are dealers and furnishers of surgical instruments and are known hereinafter also as the "Corporate Defendants."

1. Defendants Joseph Bak and Joseph Calabro were joined as party defendants pursuant to a stipulation of counsel. Docket Entry No. 38.

12. For the purpose of the Cross-Motions for Partial Summary Judgment only, the Defendants agree and stipulate that the operations of the Plaintiff A & P and the Plaintiff Columbia are generally referred to as finishing shops. The Plaintiffs purchase the basic specialty steel and subcontract a forging shop where the steel is melted at high temperatures and drop-forged into the shape of the desired surgical instrument. The forgings are then sent to the Plaintiffs' respective shops where they are milled, machined, ground, assembled, polished and then heat treated and passivated and made ready for inspection and acceptance by the Government. The Defendants further agree and stipulate that the Plaintiffs, by affidavit, aver that the entire manufacturing procedure from making of the basic specialty metal to manufacturing of the end item is performed entirely in the United States.

13. For the purpose of the Cross-Motions for Partial Summary Judgment only, the Plaintiffs agree and stipulate that in all of the following solicitations the Corporate Defendants have purchased the basic specialty steel in the United States, which steel has been melted in the United States into a specialty metal mill product; the Corporate Defendants then ship the basic specialty steel overseas to either England, West Germany, or Pakistan where the end items are manufactured; the manufactured end items are then shipped back to the United States for inspection and acceptance by the Food and Drug Administration or DLA depot personnel.

14. The end items being procured under all the following solicitations are surgical instruments composed entirely or substantially of stainless steel, a specialty metal as defined in DAR 6–301, and as such are considered specialty metals within Clause I42.[2]

15. a) On or about May 27, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–82–B–1866 ("B–1866") inviting competitive bids from qualified offerors, with a bid opening date of June 27, 1982. The end items being procured under B–1866 were 22,752 ea.; Scissors, Bandage, Angular, 7¼" (NSN6515–00–935–7138).

b) Several companies including the Plaintiff A & P and the Defendant Sicoa, submitted timely bids. The Defendant Sicoa was considered low bidder at a price of $67,118.40; the Plaintiff A & P bid a price of $88,732.00. No contract has been awarded to date.

16. a) On or about April 19, 1982, DPSC Medical issued Solicitation No. DLA120–82–R–1660 ("R–1660") as a negotiated procurement, inviting competitive proposals from qualified sources, with a closing date of May 19, 1982. The end items being procured under R–1660 were 796 ea., Scissors, Oral Surgical, Dean, Angular, 6¾", Type II (NSN 6520–00–555–1150).

b) Several companies, including the Plaintiff A & P, submitted timely proposals. E. Miltenberg, Inc. was considered the low bidder, and awarded contract No. DLA120–82–C–5553 on June 18, 1982, at a price of $9,798.76; the Plaintiff A & P bid a price of $11,144.00. E. Miltenberg manufactured the end items entirely overseas.

17. a) On or about April 7, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–82–B–1599 ("B–1599") inviting competitive bids from qualified offerors, with a bid opening date of May 6, 1982. The end items, among others, being procured under B–1599 (a joint

---

**2.** "Specialty metals" is defined in DAR 6–301 as follows:

(c) *Specialty metals means:*
(i) steels where the maximum alloy content exceeds one or more of the following limits: manganese, 1.65 percent; silicon, 0.60 percent; or copper, 0.60 percent; or which contains more than 0.25 percent of any of the following elements: aluminum, chromium, cobalt, columbium, molybdenum, nickel, titanium, tungsten, or vanadium;
(ii) metal alloys consisting of nickel, iron-nickel and cobalt base allloys containing a total of other alloying metals (except iron) in excess of 10 percent;
(iii) titanium and titanium alloys; or
(iv) zirconium and zirconium base alloys.
32 C.F.R. § 6–301 (1982)

procurement for DOD and the Veterans Administration) were various types of forceps, including 6,624 ea. (est.) (for DOD) and 5,000 ea. (est.) (for VA) Forceps, Hemostatic, Straight, Ranken, 6¼″(NSN 6515–00–334–7100); 32,040 ea. (est.) (for DOD) and 12,000 ea. (est.) (for VA) Forceps, Hemostatic, Curved, Kelly, 5½″, Type II (NSN 6515–00–334–3800); 22,320 ea. (est.) (for DOD and 15,000 ea. (est.) (for VA) Forceps, Hemostatic, Straight, Kelly, 5½″, Type I (NSN 6525–00–334–6800); 15,000 ea. (est.) (for DOD) and 4,500 ea. (est.) (for VA) Forceps, Towel, Backhaus, 3½″ (NSN 6515–00–320–4590); and 13,000 ea. (est.) (for DOD) Forceps, Towels, Backhaus, 5¼″ (NSN 6515–00–320–4600).

b) Several companies including the Plaintiff Columbia and the Defendants Sicoa and Amico, submitted timely bids. The Defendant Sicoa was considered the low bidder as to certain end items at a price of $465,-615.16; the Defendant Amico was considered the low bidder as to certain end items at a price of $88,830.00; the Plaintiff Columbia bid a price of $745,840.00 on all end items. No contract has been awarded to date.

18. a) On or about August. 9, 1982, DPSC, Medical issued Solicitation No. DLA120–82–R–2227 ("R–2227") as a negotiated procurement requesting competitive proposals from qualified sources, with a closing date of November 30, 1982. The end items being procured under R–2227, among others, were 5,472 ea. Forceps, Towel, Backhaus, 3½″ (NSN 6515–00–320–4590).

b) Two companies, including the Plaintiff Columbia and the Defendant Sicoa, submitted proposals. No contract has been awarded to date.

19. a) On or about September 23, 1982, DPSC, Medical, issued Solicitation No. DLA120–82–R–2324 ("R–2324") as a negotiated procurement requesting competitive proposals from qualified sources, with a closing date of November 24, 1982. The end items being procured under R–2324 were 34,560 ea. Forceps, Hemostatic,

Straight, Kelly, 5½″, Type I (NSN 6515–00–334–6800).

b) Several companies, including the Plaintiff Columbia and the Defendants Sicoa and Amico, submitted timely proposals. The Defendant Sicoa was awarded contract No. $151,718.40; the plaintiff Columbia bid a price of $196,992.00. The aforesaid contract price is being considered for termination for the convenience of the government.

20. a) On or about September 30, 1982, DPSC, Medical issued Solicitation No. DLA120–82–R–0046 as a negotiated procurement requesting competitive proposals from qualified sources, with a closing date of November 24, 1982. The end items being procured were 19,800 ea. Forceps, Hemostatic, Curved, Kelly, 5½″, Type II (NSN 6515–00–334–3800).

b) Several companies, including the Plaintiff Columbia and the Defendant Sicoa and Medical Devices of Fall River, Inc. ("Medical Devices") submitted timely proposals. The Defendant Sicoa was awarded contract No. DLA120–83–C–4319 on January 28, 1983 for a contract price of $21,-124.80 (4,320 ea.); Medical Devices was awarded contract No. DLA120–83–C–4381 on February 8, 1983 for a contract price of $51,084.00 (15,480 ea.); the Plaintiff Columbia bid a price of $134,040.00 on the end items.

21. a) On or about November 19, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–83–B–0273 ("B–0273"), inviting competitive bids from competitive offerors, with a bid opening date of December 21, 1982. The end items being procured, among others, under B–0273 were 2,016 ea. Forceps, Hemostatic, Half-Curved, Mixter, 7½″ (NSN 6515–00–065–3181).

b) Several companies, including the Plaintiff Columbia and the Defendant Amico, submitted timely bids. The Defendant Amico was considered the low bidder at a price of $15,926.40; the Plaintiff Columbia bid a price of $22,000.00. No contract has been awarded to date.

22. a) On or about September 24, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–83–B–0002 ("B–0002") inviting competitive bids from qualified offerors, with a bid opening date of November 22, 1982. The end items being procured under B–0002 were 10,080 ea. Forceps, Hemostatic, Straight, Kelly, 5½″ Type I (NSN 6515–00–334–6800).

b) Several companies, including the Plaintiff Columbia and the Defendant Amico, submitted timely bids. The Defendant Amico was awarded contract No. DLA–120–83–C–4238 on March 7, 1983 at a contract price of $45,460.80; the Plaintiff Columbia bid a price of $53,323.20.

23. a) On or about September 24, 1982, DPSC Medical formally advertised and issued Solicitation No. DLA120–83–B–2466 ("B–2466"), inviting competitive bids from qualified offerors, with a bid opening date of November 24, 1982. The end items being procured under B–2466 were 1,728 ea. Forceps, Hemostatic, Curved, May-Carmalt, 8″ (NSN 6515–00–334–4100).

b) Several companies, including the Plaintiff Columbia and the Defendant Amico, submitted timely bids. The Defendant Amico was awarded contract No. DLA120–83–C–4281 on February 8, 1983 at a contract price of $15,310.80; the Plaintiff Columbia bid a price of $16,000.00.

24. a) On or about November 26, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–83–B–0308 ("B–0308"), inviting competitive bids from qualified offerors, with a bid opening date of December 28, 1982. The end items being procured under B–0308 were 3,456 ea. Holder, Suture, Needle, Hegar-Mayo (NSN 651–00–299–8737).

b) Several companies, including the Plaintiff Columbia and the Defendant Amico, submitted timely bids. The Defendant Amico was considered low bidder at a price of $30,896.64; the Plaintiff Columbia bid a price of approximately $32,000.00. No contract has been awarded to date.

25. a) On or about November 12, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–83–B–0088 ("B–0088") inviting competitive bids from qualified offerors, with a bid opening date of December 14, 1982. The end items being procured under B–0088 were 16,992 ea. Forceps, Hemostatic, Curved, Rochester—Pean, 6¼″ (NSW 6515–00–334–4300).

b) Several companies, including the Plaintiff Columbia and the Defendant Sicoa, submitted timely bids. The Defendant Sicoa was awarded contract No. DLA120–83–C–4198 on February 1, 1983 at a contract price of $103,481.28.

26. a) On or about November 15, 1982, DPSC, Medical formally advertised and issued Solicitation No. DLA120–83–B–0107 ("B–0107"), inviting competitive bids from qualified offerors, with a bid opening date of December 15, 1982. The end items being procured under B–0107 were 18,360 ea. Forceps, Hemostatic, Curved, Kelly, 5½″ Type II (NSN 6515–00–334–3800).

b) Several companies, including the Plaintiff Columbia and the Defendant Sicoa, submitted timely bids. The Defendant Sicoa was awarded contract No. DLA120–83–C–4297 on February 7, 1983 at a contract price of $80,600.40; the Plaintiff Columbia bid a price of $96,390.00.

27. The Terms and conditions of the above solicitations and the contracts awarded, or to be awarded, thereunder included *inter alia*, Clause I42, "Preference for Domestic Specialty Metals" (Jan. 1982),[3] or

---

**3.** "Specialty metals" is defined in DAR 6–301 as follows:
(i) steels where the maximum alloy content exceeds one or more of the following limits: manganese, 1.65 percent; silicon, 0.60 percent; or copper, 0.60 percent; or which contains more than 0.25 percent of any of the following elements: aluminum, chromium, cobalt, columbium, molybdenum, nickel, titanium, tungsten, or vanadium;

(ii) metal alloys consisting of nickel, iron-nickel and cobalt base alloys containing a total of other alloying metals (except iron) in excess of 10 percent; (iii) titanium and titanium alloys; or

(iv) zirconium and zirconium base alloys.
32 C.F.R. § 6–301 (1982).

an amended version thereof, Clause I42, "Preference for Domestic Specialty Metals" (Oct. 1982).[4] This clause is required for inclusion by DAR 7–104.93(b).

28. DAR 6–300 *et seq.*, and the relevant contract and solicitations clauses found in DAR 7–104.93(b), are intended to implement congressional policy found in the annual Department of Defense Appropriations Act concerning restrictions on the availability of appropriated funds for the procurement of foreign source articles of certain specified commodities, including specialty metals.

29. The Department of Defense Appropriation Act, 1982, P.L. No. 97–114, 95 Stat. 1565 (1981) appropriated monies for military functions administered by DOD, for the fiscal year ending September 30, 1982.

30. The 1982 Appropriations Act contained a so-called "Buy American" provision, which is more fully discussed below.

31. On or about October 2, 1982, the Joint Resolution making continuing appropriations for fiscal year 1983, P.L. No. 97–276, 96 Stat. 1186, appropriated monies for military functions pending passage of the regular DOD appropriation act for fiscal year 1983.

32. Section 101(c) of the October Joint Resolution contained a "Buy American" clause, which is more fully discussed below.

33. On or about December 21, 1982, the Joint Resolution making further continuing appropriations for fiscal year 1983, P.L. No. 97–377, 96 Stat. 1830, made further appropriations for military functions for fiscal year 1983 by adopting at section 101(c) the text of the proposed Department of Defense Appropriation Act, 1983.

34. The December Joint Resolution contains the identical language of the Buy American provision found in the October Joint Resolution, except that "hand or measuring tools" are added.

35. All of the above solicitations and contracts awarded, or to be awarded, thereunder, are funded from appropriated monies pursuant to the 1982 Appropriations Act, the October Joint Resolution, and the December Joint Resolution.

36. The end items involved in the above solicitations are not "weapons or weapons systems."

37. The Plaintiffs protested to the U.S. Comptroller General ("GAO") the award of contracts under the above solicitations to any entity other than the Plaintiffs. The GAO denied the protests of the Plaintiffs on March 16, 1983. There are no procedures to appeal this decision by the GAO.

## II. JURISDICTION

Preliminarily, the Court must resolve the jurisdiction question raised in the Government Defendants' Motion To Dismiss, Or In The Alternative, To Transfer, and the Motion Of Defendant Surgical Instrument Co. Of America To Dismiss, Or In The Alternative, To Transfer.

From the outset of this litigation, it was agreed by the parties herein that the award status of the solicitations encompassed by this action is as follows:

| | Solicitation No. | Award Status |
|---|---|---|
| 1. | DLA120–82–B–1866 | unawarded |
| 2. | –82–R–1660 | awarded 6/18/82 |
| 3. | –82–B–1599 | unawarded |
| 4. | –83–B–0541 | unawarded |
| 5. | –82–R–2227 | unawarded |
| 6. | –82–R–2324 | awarded 2/8/83 |
| 7. | –82–R–0046 | awarded 1/28/83; 2/8/83 |
| 8. | –83–B–0273 | unawarded |
| 9. | –83–B–0002 | awarded 3/7/83 |
| 10. | –83–B–2466 | awarded 2/8/83 |
| 11. | –83–B–0308 | unawarded |
| 12. | –83–B–0088 | awarded 12/14/82 |
| 13. | –83–B–0107 | awarded 2/1/83 |

4. The January, 1982 Clause I42 provides in pertinent part as follows:

(a) The contractor agrees that any specialty metals (as hereinafter defined) furnished by it or purchased by it for direct incorporation in any article delivered to the Government under this contract shall have been melted in the United States, its possessions, or Puerto Rico. Provided, That this clause shall have no effect to the extent that the Secretary or his designee determines that a satisfactory quality & sufficient quantity of such articles cannot be acquired as and when needed at U.S. market prices.

Of the thirteen solicitations initially involved in this action, seven have already been awarded by DPSC and six remain unawarded. The Government also points out that of the thirteen different procurement contracts, three consist of subparts, each of which was bid upon or negotiated independently. *See* Docket Entry No. 15, Exhibit "A." Thus, in total there are 36 individual procurements in question, some of which can be classified as being in the "pre-award" stage, while the remainder are in the "post-award" stage.[5]

Plaintiffs assert essentially that this Court properly has jurisdiction over all of plaintiffs' claims by virtue of the Federal Courts Improvements Act, Pub.L. No. 97–164, 96 Stat. 25, 40 (1982) ("FCIA"), amending 28 U.S.C. § 1491(a)(3), as read in conjunction with such cases as *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970) and its progeny, and *United States v. John C. Grimberg Co.*, 702 F.2d 1362 (C.A.Fed.1983). The government argues that district courts lack jurisdiction over so-called "disappointed bidder suits" against the United States and its officers. In the alternative, the government contends that, at the very least, plaintiffs' pre-award claims must be dismissed for lack of subject matter jurisdiction.

The government's argument is sourced from its interpretation of section 133(a)(3) of FCIA, 28 U.S.C. § 1491(a)(3), which sets forth in part the jurisdiction of the new United States Claims Court as follows:

> (3) To afford complete relief on any contract claim brought before the contract is awarded, the [Claims] court shall have *exclusive* jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security.

*Id.* § 1491(a)(3) (emphasis added). The government reads Congress' waiver of sovereign immunity in § 1491(a)(3) as affording disappointed bidders the opportunity to request declaratory or injunctive relief *only* prior to bid award, *and only* in the Claims Court. *Opal Mfg. Co., Ltd. v. UMC Industries*, 553 F.Supp. 131 (D.D.C.1982); *London Fog Co. v. Defense Logistics Agency*, No. 4–82–1334 (D.Minn.1982). Moreover, the government would further restrict the sole avenue of relief disappointed bidders may pursue in accordance with recent Claims Court decisions that its new jurisdiction extends only to those pre-award claims in which contractual, as opposed to statutory, obligations are imposed on the United States. *Quality Furniture Rentals, Inc. v. United States*, 1 Cl.Ct. 136 (1983); *Gibralter Industries v. United States*, 2 Cl.Ct. 589 (1983); *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373 (1983); *Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613 (1983). Because the government agrees that plaintiffs' claims involve alleged statutory obligations on the United States agencies in question, the government concludes plaintiffs have no forum in which their arguments can be heard and, therefore, that this action should be dismissed.

A brief review of the legislative history of § 1491(a)(3) is essential to the resolution of this jurisdictional question. Prior to 1970, contractors were generally barred from protesting the award of contracts in federal courts on the authority of the Supreme Court's decision in *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). In 1970, the law in regard to bid protest cases changed substantially with the decision of the Court of Appeals for the District of Columbia Circuit in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). The court there held that, although a disappointed bidder had no right to an award of the contract, he could sue a federal officer

---

**5.** In their Stipulation To Amend Caption And Complaint (Docket Entry No. 38), the parties agreed "[t]hat the complaint (including paragraphs 15 and 16) and the prayer for relief, and all other pleading and briefs be amended to strike and dismiss therefrom all reference to Solicitation No. DLA120–83–B–0541."

(generally the head of the agency) to satisfy the public interest in requiring government agencies to follow applicable regulations controlling government contracting. *See also Steinthal & Co. v. Seamus,* 455 F.2d 1289 (D.C.Cir.1971). The Third Circuit Court of Appeals adopted *Scanwell* and established a limited scope of review in bid dispute cases:

> [C]ourts should not overturn any procurement determination unless the aggrieved bidder demonstrates there was no rational basis for the agency's decision. Even when that showing has been made, prudent judicial discretion may still refuse declaratory or injunctive relief because of overriding public interests. A showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief.

*Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 434 (3d Cir.1979) (citations omitted). *See also Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir.1973).

Prior to the enactment of FCIA, the United States Court of Claims did not have injunctive or declaratory powers and could only award money damages. *Heli-Jet Corp. v. United States, supra* at 619; *Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43 (1982); *Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970). Because of this express lack of equitable powers, plaintiffs turned to the district courts to "redress injurious procurement actions associated with contract award." *Indian Wells Valley Metal Trades Council v.*

*United States, supra* at 45. Bidders brought pre-award and post-award claims to the district courts for resolution.

With the enactment of FCIA, the new United States Claims Court was granted the power to "grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief." 28 U.S.C. § 1491(a)(3). This increase in its powers was granted in order to "afford complete relief in any contract claim brought before the contract is awarded." *Id.*

In *Quality Furniture Rentals v. United States, supra,* and other recent cases,[6] the Claims Court has defined the limits of its jurisdiction by interpreting the language of § 1491(a)(3). The Claims Court has determined that it was granted new equitable powers only in those pre-award cases in which "a bid complies with the terms of a bid invitation but is, nevertheless, not fully and fairly considered." *Ingersoll-Rand Co. v. United States, supra* at 377. Where the complaint of the plaintiff does not question the procurement decision of the agency in considering its bid, or those of its competitors, but rather questions the authority of the agency to issue the specific solicitations or the agency's compliance with its regulations, the Claims Court has stated it was not granted that jurisdiction in FCIA by Congress. Thus, the Claims Court has decided that its new jurisdiction extends only to those pre-award claims in which *contractual,* as opposed to *statutory,* obligations are imposed on the United States.[7]

---

**6.** *See, e.g., Gibralter Industries v. United States,* 2 Cl.Ct. 589 (1983); *Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373 (1983); *Heli-Jet Corp. v. United States,* 2 Cl.Ct. 613 (1983); *Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43 (1982); *Cecile Industries, Inc. v. United States,* 2 Cl.Ct. 690 (1983).

**7.** The Claims Court specifically set forth its distinction between contractual and statutory duties in *Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983) (emphasis added):

> While statutes and regulations pertaining to the bid solicitation process require the United States to structure bids fairly and in a manner designed to assure the lowest cost, these pro-

visions create statutory rather than contractual obligations. Thus, the United States owes bidders no *contractual* duty to comply with procurement regulations. Since our injunctive authority turns upon the existence of a contractual relationship, *see* pp. 3–4 *supra,* a duty owed by virtue of statute or regulation cannot, under the plain terms of section 1491(a)(3), justify exercise of that authority. *Because the obligation to follow procurement regulations is statutory and not contractual, this court has no jurisdiction under section 1491(a)(3)* to correct alleged errors in the bid invitation itself through issuance of an injunction. Defendant's motion for summary judgment is therefore granted as to that por-

All parties agree that plaintiffs' claims herein are statutory in nature and that the Claims Court would deny jurisdiction over all of plaintiffs' pre-award, as well as post-award, claims. The government then interprets § 1491(a)(3) as a strictly limited waiver of sovereign immunity only with respect to contractual pre-award claims, over which the Claims Court has exclusive jurisdiction. Under the government's interpretation of § 1491(a)(3), a disappointed bidder may only seek declaratory and equitable relief in the Claims Court, and only for pre-award claims of the contractual nature. The district courts, under the government's view, have no jurisdiction to hear any pre-award or post-award disappointed bidder suits for declaratory or equitable relief.

■ We cannot adopt the government's reading of § 1491(a)(3). A number of courts have rejected that view and determined that *Scanwell*-type jurisdiction over post-award claims still resides in the federal district courts:

> *Although the language of the statute alone might leave room for debate in cases where bid protests were filed prior to award, the legislative history cited by Chief Judge Markey for the* Grimberg *majority,* 702 F.2d at 1369–72, 1374–76, *convinces us that Congress did not intend to impair the jurisdiction of the district courts in suits like BK's which were brought after the award.* As said in the House report, "the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts. The dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date." H.R.Rep. No. 312, *supra,* at 43. Indeed, the dissents in *Grimberg,* as we read them, would agree that this suit was not within the exclusive jurisdiction of the Claims Court under § 1491(a)(3) since the protest was filed after the award, *see* 702 F.2d at 1884 (Kashiwa, J., dissenting), 1389 (Bennett, J., dissenting).

tion of plaintiff's complaint which challenges

*B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 726 (2d Cir.1983) (emphasis added). *See United States v. John C. Grimberg Co.,* 702 F.2d 1362 (C.A.Fed. 1983); *Aero Corp. v. Department of Navy,* 558 F.Supp. 404 (D.D.C.1983); *American District Telegraph v. Department of Energy,* 555 F.Supp. 1244 (D.D.C.1983). This Court concurs with those decisions.

A more difficult question arises with respect to plaintiffs' pre-award claims. The government relies on *Opal Mfg. Co. v. UMC Industries, Inc.,* 553 F.Supp. 131 (D.D.C.1982) and *London Fog Co. v. Defense Logistics Agency,* No. 4–82–1334 (D.Minn.1982), in which § 1491(a)(3) was interpreted to mean that the Claims Court was granted exclusive jurisdiction over pre-award contract claims to the exclusion of the district courts. These cases, however, were decided prior to the Claims Court's limitation of its pre-award jurisdiction.

Plaintiffs contend that these decisions are contrary to the express intent of Congress in enacting FCIA. They cite the legislative history of FCIA in support of their argument that Congress' use of the term "exclusive jurisdiction" in § 1491(a)(3) was not intended to bear the same meaning as the same phrase used in other jurisdiction statutes. Plaintiffs contend that Congress gave the Claims Court jurisdiction over pre-award contract claims coextensive with the district courts according to the *Scanwell* doctrine, but excluding the administrative agencies' boards of contract appeals. Plaintiffs' position is well supported in the history of FCIA.

The Judiciary Committee of the House of Representatives reported the bill containing the language found in section 133(a) of the FCIA and explained in its report (H.Rep. No. 97–312, 97th Cong., 1st Sess. 43–44) (emphasis added):

> The new section 1491(a) does give the new Claim Court the augmented power to grant declaratory judgments and give equitable relief *in contract actions prior to award.* This engaged authority is

the terms of the RFQ.

exclusive of the Board of Contract Appeals and *not to the exclusion of the district courts*. It is not the intent of the Committee to change existing case law *as to the ability of parties to proceed in the district court* pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action. *See, e.g., Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir. 1970). Nor is it the intent of the Committee to oblige lawyers, litigants, and possible witnesses to travel to Washington, D.C. *whenever equitable relief is sought in a contract action prior to award.* Although Claims Court judges will travel, they cannot be expected to do so at extremely short notice. Therefore, for the time being, *the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts. The dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date.*

Similarly, the Senate Judiciary Committee reported its bill, S. 1700, with the same language in section 133(a) as reported by the House. The Senate committee's report echoed the comments by the House on the question of jurisdiction of the new Claims Court.

By conferring jurisdiction upon the Claims Court to award injunctive relief *in the pre-award stage* of the procurement process, *the Committee does not intend to alter the current state of the substantive law in this area.* Specifically, *the Scanwell doctrine as enunciated by the D.C. Circuit Courts of Appeals in 1970 is left in tact. See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Moreover, the Committee expects that the court will utilize the authority conferred upon it by this sec-

tion only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials to deny qualified firms the opportunity to compete fairly for the procurement award . . .

Since the court is granted jurisdiction in this area, boards of contract appeals would not possess comparable authority pursuant to their last sentence of section 8(d) of the Contract Disputes Act.

S.Rep. No. 97–275, 97th Cong., 1st Sess. 22–23 (emphasis added), U.S.Code Cong. & Admin.News 1982, pp. 11, 33. Senator Robert Dole, manager of the bill, expressed the same reasoning for that provision of the bill, section 133(a), on the floor of the senate. Concerning the power of the Claims Court and district courts to grant relief, Senator Dole explained

By conferring jurisdiction upon the Claims Court to *award injunctive relief in the pre-award stage of the procurement process, the bill does not intend to alter the current state of the substantive law in this area.*

127 CONG.REC. S145692–S14694 (December 8, 1981) (emphasis added).

The government points to the apparent discrepancy between the standard meaning afforded the term "exclusive jurisdiction" in other jurisdiction statutes,[8] and the abundant legislative history cited by plaintiffs, and argues that the foundation of plaintiffs' argument is "planted legislative history" that should be disregarded by this Court. *See Harold v. United States*, 634 F.2d 547, 553–54 (Ct.Cl.1980) (Nicholas, J., concurring). We find nothing in the record indicating that this legislative history is "planted," or that it purports to be more than an explanation of the bills as reported by the respective committees and managers of the bills. We further note that the same history has been cited and relied upon by the Second Circuit, and Chief Judge

---

8. The term "exclusive jurisdiction" is defined in Black's Law Dictionary at page 507 (rev. 5th ed. 1979) as follows:

That power which a court or other tribunal exercises over an action or over a person to the exclusion of all other courts. That forum in which an action must be commenced because no other forum has the jurisdiction to hear and determine the action.

Markey of the Claims Court, among others, in their efforts to interpret § 1491(a)(3). *See, e.g., B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 721–26 (2d Cir.1983); *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1369–72, 1374–76 (C.A.Fed. 1983) (en banc); and cases cited at note 6 *supra.*

▆▆▆ In interpreting § 1491(a)(3), this Court is aware that ordinarily judicial inquiry is complete when the terms of the statute are unambiguous. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). If the language of the statute is plain, there is no need for further construction of the statute and the statute will be taken to mean what it says. *Adams Exp. Co. v. Kentucky,* 238 U.S. 190, 35 S.Ct. 824, 59 L.Ed. 1267 (1914); *United Mine Workers of America v. Federal Mine Safety and Health Review Commission,* 671 F.2d 615, 621 (D.C.Cir.1982). In this case, however, numerous courts have delved into the legislative history of § 1491(a)(3) in an attempt to resolve its inherent ambiguities. "[W]here, as here, the language of the statute [§ 1491(a)(3)] is nebulous, a clear expression of legislative intent must be given great weight." *Quality Furniture Rentals, Inc. v. United States,* 1 Cl.Ct. 136, 141 (1983). Moreover, the text or legislative history of a statute must provide " 'clear and convincing' evidence of congressional intent ... before a statute will be construed to restrict access to judicial review." *Johnson v. Robinson,* 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1168–69, 39 L.Ed.2d 389 (1974). There is a "normal presumption in favor of judicial review." *Whitecliff, Inc. v. United States,* 536 F.2d 347, 350 (Ct.Cl.1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

The government does not contend that plaintiffs' pre-award claims would not have been reviewable under the pre-FCIA *Scanwell* doctrine.[9] All parties agree that plaintiffs' pre-award claims herein cannot be heard in the Claims Court in view of that court's distinction between contractual and statutory pre-award cases. Thus, if this Court dismisses plaintiffs' pre-award claims, there will be no forum in which those claims can be heard until the government awards the contracts and plaintiffs re-file their complaint in this Court based on their then post-award claims. That result is contrary to the statement of the Senate Judiciary Committee that it did "not intend to alter the current state of substantive law in this area. Specifically, the *Scanwell* doctrine as enunciated by the D.C.Circuit Courts of Appeals in 1970 is left in tact." FCIA was intended to "modestly increase" the power of the Claims Court *"not* to the exclusion of the district courts." The government has cited no legislative history supporting its contention that Congress intended the extreme effect of confiscating from plaintiffs their long-standing access to federal courts on their statutory pre-award claims.

Furthermore, the case at bar is unique in that it involves a mixture of pre-award and post-award claims, the post-award claims clearly predominating, and all of which involve identical substantive issues. Under the facts of this case, it clearly would be inequitable, inefficient, and contrary to the intent of Congress to dismiss plaintiffs' pre-award claims. As is argued in the alternative, to transfer these claims to the Claims Court would be futile. Accordingly, the Court will deny defendants' motions to dismiss, or in the alternative, to transfer.

### III. CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs brought this action challenging the DOD's interpretation of Section 723 of the 1982 Department of Defense Appropriation Act, P.L. No. 97–114, 95 Stat. 1565 (1981) ("1982 Appropriations Act"), Section 101(c) of the 1982 Joint Resolution dated

---

9. The Third Circuit has held that in government procurement cases "(t)he courts have the obligation to insure agency compliance with statutory and regulatory law." *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 434 (3d Cir.1979).

October 2, 1982, P.L. No. 97–276, 96 Stat. 1186 ("October Joint Resolution"), and Section 723 of the Joint Resolution dated December 21, 1982, P.L. No. 97–377, 96 Stat. 1830 ("December Joint Resolution").

Plaintiffs contend that the aforelisted acts of Congress prohibit DOD from purchasing specialty metal end products which have not been entirely manufactured in the United States or its possessions. The government and the corporate defendants submit that only the melting of the specialty metal is required to be done domestically while the end products may be produced outside of the United States or its possessions.

The 1982 Appropriations Act, Section 723, reads in pertinent part as follows:

No part of any appropriation contained in this Act, except for small purchases in amounts not exceeding $10,000, shall be available for the procurement of any article of food, clothing, cotton, woven silk or woven silk blends, spun silk yarn for cartridge cloth, synthetic wool (whether in the form of fiber or yarn or contained in fabrics, materials, or manufactured articles), *or specialty metals including stainless steel flatware, not grown, reprocessed, reused, or produced in the United States or its possessions....*

*Id.* § 723 (emphasis added). The relevant language in the October and December Joint Resolutions is the same, with the latter being amended by the inclusion of the words "or hand or measuring tools" after the words "including stainless steel flatware."

It is uncontested that the items stated in plaintiffs' complaint were required by the applicable specifications, to be made of specialty metal steel. These items were or would be purchased from funds appropriated by the 1982 Appropriation Act and the subsequent joint resolution.

Plaintiffs have alleged that the respective "Buy American" provisions of the 1982 Appropriation Act and Joint Resolutions have not been properly implemented by the Defense Acquisition Regulation ("DAR") 6–302, which implements the Appropriation Act and Joint Resolution restrictions. DAR 6–302 reads in pertinent part as follows:

Restriction. Except as provided in 6–303, there shall not be acquired supplies consisting in whole or in part of any food, clothing ... or coated synthetic fabric, which have not been grown or produced in the United States or its possessions; *or specialty metals including stainless steel flatware which have not been melted in steel manufacturing facilities located within the United States or its possessions ....*

*Id.* § 6–302 (emphasis added).

The DPSC and DLA included in the solicitations Clause I 42, Preference for Domestic Specialty Metals, which is identical in language to DAR 7–104.93(b). Paragraph (a) of the clause provides, in pertinent part, as follows:

The Contractor agrees that any specialty metals (as hereinafter defined) furnished by it or purchased by it for direct incorporation in any article delivered to the Government under this contract shall have been melted in the United States, its possessions, or Puerto Rico....

Paragraph (b) of the clause defines the term specialty metals as

(i) steels where the maximum alloy content exceeds one or more of the following limits: manganese, 1.65 percent; silicon, 0.60 percent; or copper, 0.60 percent or which contains more than 0.25 percent of any of the following elements: aluminum, chromium, cobalt, columbiun, molybdenum, nickel, titanium, tungsten, or vanadium; (ii) metal alloys consisting of nickel, iron-nickel and cobalt base alloys containing a total of other alloying metals (except iron) in excess of ten percent (10%); (iii) titanium and titanium alloys; or (iv) zirconium and zirconium base alloys.

The DPSC has evaluated offers, including the offers of plaintiffs for the solicitations in the complaint on the basis of the provisions of the above restrictions in DAR 6–302, and the language of DAR 7–104.-

93(b), which require only that the specialty metal material from which items or end products are manufactured be melted in the United States. Plaintiffs dispute this construction of the statutory language and protest the situation that has developed "wherein bidders may supply end items which are entirely manufactured, forged, fabricated or produced outside of the United States or its possessions, so long as they certify that the basic specialty metal, in this instance, certain kinds of stainless steel, was melted in the United States or its possessions."

With respect to the solicitations in question, plaintiffs believe they are the lowest responsive and responsible bidders who intend to manufacture the end items domestically. Plaintiffs also contend that the corporate defendants, "who are using cheaper foreign labor, have, or will, receive award of these contracts from the individual Defendants in violation of the provisions of law and Congressional policy."

Plaintiffs raised this issue, among others, before the United States Comptroller General ("GAO") pursuant to regulation 4 C.F.R. § 21 *et seq.* These arguments were denied on March 16, 1983 in a GAO division captioned *In The Matter of A & P Surgical Company, Inc.; Columbia Surgical Instruments Co., Inc.* (*See* Exhibit 1 to Docket Entry No. 24).

 Initially, the Court notes that its standard of review of this type of issue is limited. "When faced with a problem of statutory consideration, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964); *Blum v. Bacar,* 457 U.S. 132, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *See also, Quern v. Mandley,* 436 U.S. 725, 735, 98 S.Ct. 2068, 2074, 56 L.Ed.2d 658 (1977); *State of New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1283 (3d Cir.1981). Thus, in order to sustain an agency's statutory interpretation, the court

need not find that [the agency's] construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instances in judicial proceedings... All that is needed to support the [agency's] interpretation is that it has "warrant in the record" and a "reasonable basis in law."

*State of New Jersey v. Department of Health and Human Services,* 670 F.2d at 1283, *quoting Unemployment Compensation Commission of Alaska v. Aragon,* 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

More specifically, in the context of bidder disputes, the Third Circuit Court of Appeals has made it clear that the district court's review of an agency's procurement decision is "extremely limited in scope." *Princeton Combustion Research Lab v. McCarthy,* 674 F.2d 1016, 1021 (3d Cir. 1982)

Our review of the agency's purchasing decision *including its interpretation of the procurement regulations is quite limited.* Judicial intrusion into government purchases necessarily delays completion of contract and increases costs, with little measurable benefit to the public. We recognized this problem in *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 435 (3d Cir.1979), and stated that *a court should not substitute its judgment for that of the contracting agency. Rather the court should determine whether the procurement decision was a rational one; if so the agency's decision must be upheld.*

*Allis-Chalmers Corp. v. Friedkin,* 635 F.2d 248, 252–53 (3d Cir.1980) (emphasis added). *See also Sea-Land Service, Inc. v. Brown,* 600 F.2d 429 (3d Cir.1979).

 Even where a showing of irrationality is made, "prudent judicial discretion may still refuse declaratory or injunctive relief because of overriding public interest." *Id.* at 434. The interests to be weighed are "the practical considerations of efficient procurement of supplies for continuing government operation; the pub-

lic interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through agency adherence to statutes and regulations." *Id.* If this Court determines, however, "that an agency's procurement decision is rational, its inquiry is at an end: the District Court must deny the motion for preliminary injunction, and may not go on to engage in a balancing of the three factors specified in *Sea-Land.*" *Princeton Combustion Research Lab. v. McCarthy,* 674 F.2d at 1022.

Bearing this limited scope of review in mind, we find that the government's procurement decisions pursuant to DAR 6–302 are rational, and have a reasonable basis in the law. The Comptroller General upheld the DOD's reliance on DAR 6–302 based primarily on the legislative history of the "Buy American" provisions:

> [W]e believe the critical factor to be that the wording of DAR § 6–302 regarding "melting" appears to be based on interpretation of the Act and House Report 92–1389, and the regulation has been in existence for over 10 years and the Congress has not objected to DOD's interpretation of the statute. We have noted that deference is to be accorded to the interpretation given a statute by the *Colorado State University,* B–194627, December 27, 1979, 79–2 CPD 438. Moreover, we agree with DLA that *National Graphics,* decided before specialty metals was added and DAR § 6–3–2 was issued, is not controlling here, based on the placement of the wording in the statute.

> Since the DAR provision has a reasonable basis and has contained the disputed working for 10 years without congressional objection, we do not object to the DOD interpretation.

*In The Matter of A & P Surgical Co., Inc.; Columbia Surgical Instruments Co., Inc.,* at 6. We find a reasonable basis in the law for the Comptroller General's conclusion.

Beginning in 1941 and continuing to the present, the annual defense appropriation acts have contained a limitation on the procurement powers of DOD, and its predecessor agencies, by restricting the foreign purchase of certain commodities. Typically, these "Buy American" provisions have prohibited the spending, availability, or use of appropriated funds (monies appropriated by Congress for military functions) for procurements of foreign goods. The Fifth Supplemental National Defense Appropriation Act, Pub.L. No. 29, 55 Stat. 123 (1941), prohibited the availability of appropriated funds "for the procurement of any article of food or clothing not grown or produced in the United States." 55 Stat. at 125. By 1952, after the creation of DOD, a loophole had developed which permitted a manufacturer to buy foreign yarn, weave it into cloth in the United States, and thus make the article American. To overcome that result with respect to articles made of cotton or wool, Congress, in 1952, adopted an amendment proposed by Representative Berry which resulted in the following revision:

> Provided, that no part of this or any other appropriation contained in this Act shall be available for the procurement of any article of food, clothing, cotton or wool (whether in the form of fiber or yarn or contained in fabrics, materials, or manufactured articles) not grown, reprocessed, reused, or produced in the United States...

Department of Defense Appropriation Act, 1953, Pub.L. No. 488, 66 Stat. 517, 521 (1952).

Over the years Congress has added to the list of commodities which come within "Buy American" provisions. Specialty metals were first added to the list of commodities of the "Buy American" provision in section 724 of the Department of Defense Appropriation Act, 1973, Pub.L. No. 92–570, 86 Stat. 1184 (1972). The clause read as follows:

> No part of any appropriation contained in this Act shall be available for the procurement of any article of food, cloth-

ing, cotton, woven silk or woven silk blends, spun silk yarn for cartridge cloth, synthetic fabric or coated synthetic fabric, or wool (whether in the form of fiber or yarn or contained in fabrics, materials, or manufactured articles), *or specialty metals* not grown, reprocessed, reused, or produced in the United States or its possessions, except to the extent that the Secretary of the Department concerned shall determine that satisfactory quality and sufficient quantity of any articles of food and clothing or any form of cotton, woven silk blends, spun silk yarn for cartridge cloth, synthetic fabric or coated synthetic fabric, wool, grown, reprocessed, reused, or produced in the United States or its possessions, *or specialty metals* cannot be procured as and when needed in United States or its possessions cannot be procured as and when needed at the United States market prices and except procurements outside the United States in support of combat operations, procurements by vessels in foreign waters, and emergency procurements or procurements of perishable foods by establishments located outside the United States for the personnel attached thereto: Provided, That nothing herein shall preclude the procurement of foods manufactured or processed in the United States or its possessions.

The 1973 appropriation bill was accompanied by H.R.Rep. No. 92–1389, wherein specific reference was made to Section 724 and the basis for amending that section was explained. The following portion of the comment specifically supports the government's interpretation of Congress' intent:

"Section 724, The 'Buy American' provision, is amended to include the words 'specialty metals' in the list of items which are prohibited from being purchased outside of the United States. The Committee held hearings in which this proposal was made by representatives of the specialty metals industry. The Committee was favorably impressed by the evidence presented and wrote to the De-

partment of Defense with regard to this matter. The Assistant Secretary to Defense for Installations and Logistics replied that in general the Department of Defense was in agreement with the statement made by the witnesses concerning the need of the Department of Defense for a viable specialty metals industry in this country. The Secretary further pointed out that the Defense requirements for these materials are currently only a small percentage of the U.S. consumption, and that an action such as that recommended by the Committee would not in itself solve the problems of this industry. The Secretary did state strongly that this domestic capability must be preserved.

"Further hearings were held by the Subcommittee on General Legislation of the Committee on Armed Services of the United States Senate with respect to specialty steels and their essentiality to national security and a favorable report was issued in this regard. *The action recommended by the Committee means that no part of any appropriation contained in this Act shall be available or be expended for the procurement of any article containing any specialty metal not melted in steel manufacturing facilities located within the United States or its possessions* to the extent that the Secretary of the Department concerned shall determine that a satisfactory quality and sufficient quantity of any such article containing *specialty metals melted in steel manufacturing facilities located within the United States and its possessions* cannot be procured as and when needed at United States market prices and except for procurement outside of the United States in support of combat operations."

Further support for the government's view of Congress' intent is found in the steel industry testimony to which this House Report refers, wherein a spokesman for Colt Industries, Inc. concluded as fol-

lows: "Gentlemen, to sum up our recommendations to your committee, I propose: (1) the amendment of section 724 to require where practicable that all specialty metal products used in hardware procured by the military *be formed from specialty metals melted in the United States....*" *Hearing on H.R. 16593 Before The Subcommittee On Defense Of The House Committee On Appropriations,* 92d Cong., 2d Sess. 343–44 (1972). The Court also takes note of the June 8, 1972 letter from Barry J. Shillito, Assistant Secretary of Defense to the Honorable George McMahon, Chairman, Committee on Appropriations. That letter includes a significant reference to an inquiry received from Congressman McMahon:

> Reference your letter of May 12, 1972, to Secretary Laird concerning the depressed economic condition of the U.S. specialty metals industry. In this letter *you requested the Department of Defense views as to the desirability* of amending section 724 of the Defense Appropriation Act to require, where practicable, that all specialty metal products used in hardware by the military be formed from specialty metals *melted in the United States.*

*Id.* (emphasis added). (*See* Docket Entry No. 24, Exhibit 5 at 346). Thus, it is clear that there is a reasonable basis in the law for the GAO's ten-year old interpretation of the "Buy American" provisions of the appropriation acts and joint resolutions as manifested in DAR 6–302. Congress contemplated a restriction only on foreign melting of specialty metals to be procured by DOD.

■ Based on this legislative history, the Comptroller General set forth a reasonable and rational reading of the specific language of the provision in dispute, conclud-

ing that specialty metals were not to be identically classified with cotton or the other items listed prior to specialty metals. Congress placed the term "specialty metals" in the "Buy American" clause of the 1973 Appropriations Act *after* the parenthetical "(whether in the form of fiber or yarn or contained in fabrics, materials or manufactured articles)" and *after* the word "or." This connotes that specialty metals, but not *articles of* specialty metals, were made subject to the "Buy American" restriction. In other words, the amended Act was meant to prohibit foreign production of specialty metals *in their material stage* but *not* foreign manufacture of any *article* of specialty metals. We find that this construction reflects the legislative intent with respect to the restrictions sought to be imposed on the various items listed in the provision.

Accordingly, this Court will not invalidate DAR 6–302. Defendants' motions for partial summary judgment will be granted and Plaintiffs' motions for partial summary judgment and preliminary injunction will be denied.

An appropriate Order follows.[10]

### ORDER

AND NOW, this 7th day of February, 1984, in accordance with the foregoing Memorandum, it is hereby ORDERED as follows:

(1) The Government Defendants' Motion To Dismiss Or, In The Alternative, To Transfer is DENIED;

(2) The Motion of Defendant Surgical Instrument Co. Of America To Dismiss Or, In The Alternative, To Transfer is DENIED;

---

10. The parties have stipulated that resolution of the present cross-motions for partial summary judgment does not entirely dispose of this action. "The questions reserved for later fact-finding and litigation are the alleged failure of the Corporate Defendants to comply with DAR6– 302 *et seq.* in its present form and the issue of irreparable harm to the Plaintiffs." Docket Entry No. 22 at 2. These issues in addition to the pending discovery motions will be addressed at a prompt conference of counsel.

(3) Plaintiffs' Motion For Preliminary Injunction And Summary Judgment is DENIED;

(4) Plaintiffs' Motion For Partial Summary Judgment is DENIED and Defendants' Motions For Partial Summary Judgment are GRANTED, inasmuch as they address the issue whether DAR 6–301 *et seq.* accurately reflect the statutory language of the "Buy American" provision of the applicable annual defense appropriation acts. Accordingly, judgment is hereby entered in favor of Defendants and against Plaintiffs on the aforementioned issue which was the subject of the Cross-Motions For Partial Summary Judgment.